### OWENS v. UNITED STATES.
#### Civ. No. 268.

United States District Court,
W. D. Arkansas, Harrison Division.
July 2, 1951.

622

William S. Walker and Virgil D. Willis (of Willis & Walker), Harrison, Ark., for plaintiff.

Lester L. Gibson, Sp. Asst. to Atty. Gen., Hugh M. Bland, Asst. U. S. Atty., Fort Smith, Ark., for defendant.

JOHN E. MILLER, District Judge.

This is a suit by the plaintiff to recover fraud penalties assessed against him and paid for the calendar years 1944, 1945, 1946 and 1947. The correctness of the deficiency assessments for the said years paid by the plaintiff is not here attacked, and the sole issue before the court is whether civil fraud penalties were properly assessed and collected by the Commissioner of Internal Revenue. To resolve this issue the court must determine whether the admitted deficiencies for the years in question were due to "fraud with intent to evade tax" within the meaning of Title 26, U.S.C. § 293(b).

The case was tried to the court on June 12, 1951. At the conclusion of the presentation of the evidence, the case was submitted subject to the filing of briefs by the respective parties. Said briefs have now been received, and the court, after considering the pleadings, testimony and exhibits there-

to, and briefs, makes and files its findings of fact and conclusions of law, separately stated.

### Findings of Fact.

1

Plaintiff is a physician and surgeon and has practiced his profession at Harrison, Arkansas, since 1922. In 1935 he and Dr. J. T. Gladden, as partners, opened a clinic, which by 1940 was expanded to a 20 bed hospital, and operated as a combined clinic and hospital throughout the years in question. It was their practice for each to operate the institution for six months, pay all bills and expenses, and at various intervals during the period, depending on income and the necessary reserve for operating expenses, to account for and pay to the other half of the profit.

In 1943 and prior thereto there were approximately 20 doctors in the five county area of which Harrison in Boone County was the center. In the town and vicinity of Harrison itself there were seven active doctors. In addition to the institution operated by the plaintiff and Dr. Gladden there were one or two other small clinics in Harrison, and small clinics at Marshall in Searcy County and Berryville in Carroll County, Arkansas. Thus, patients requiring hospitalization and surgery from the surrounding territory were usually referred to the plaintiff and Dr. Gladden. After 1943 there was a rapid decline in the number of doctors in the area by reason of death, retirement and calls to Army service so that during the war years of 1943 to 1946 the plaintiff, Dr. Gladden and a Dr. Fowler were the three most active doctors, that is, the ones upon whom the bulk of the workload fell, in the area, which, during that period, consisted of some 40,000 people.

Prior to 1943 the plaintiff maintained a normal social and recreational life, taking off one day per week from his work and taking the usual two weeks' vacation during the year. After that time, however, he experienced a marked change in the relationship between his social and business life. The demands of those in need of medical aid were such as to require him to work an average of 14 to 16 hours per day, and often it was necessary to remain on duty at the clinic and hospital all or a major portion of the night. He saw and administered to an average of 35 to 40 patients per day during the period involved herein.

Also, until 1945, he served as secretary and a member of the Board of State Medical Examiners, which position, although not in and of itself unduly burdensome, added to the stress of his duties.

However, during the period involved he did not find it necessary to give up all social and recreational activities, but, as stated above, his recreational activities were severely curtailed, and his extended vacation was usually limited to one week a year. Apparently, the situation reflected here was in common with other and all reputable, able, conscientious and zealous physicians and surgeons.

2

During the period involved the principal source of plaintiff's income was his practice and the hospital-clinic. In addition he made various investments in real estate, purchasing one or two buildings, one of which he converted in part to an apartment house, and at least one filling station. He also owned certain stocks and bonds, from which he derived some income, and purchased stock in and became a director of a bank in Harrison.

His revealed bookkeeping methods were comparatively simple. It was his practice for a daily pad or sheet to be filled out on each patient and a notation made of any charges and of any collections received for the patient's treatment. These pads were made by himself, or the nurse or other employee on duty who received the patient. In this regard, as is usual, the majority of the routine office treatments were administered by his nurse. At the end of each day, or as soon thereafter as time permitted, the plaintiff entered the daily pad entries in a log book that he kept. All entries in this log were made personally by the plaintiff. If the fee was not collected, or in the case of all charge treatments, an entry was made in the main ledger kept for that purpose. At the end of each day the daily receipts were either deposited in the bank by the

plaintiff, or were placed in his safe and deposited, ordinarily by the plaintiff when he found time to go to the bank.

Plaintiff's regular nurse left his employment in 1943. She was replaced by a young lady from Siloam Springs, who remained with him for 8 or 10 months. She in turn was replaced by a Miss Jeffers who stayed for approximately one year. Next was a Mrs. Campbell who remained for approximately one year. None of these employees were experienced in handling accounts or financial matters.

Separate bank accounts were maintained by the plaintiff and by the hospital-clinic. Often money was deposited in his personal account which belonged to the hospital-clinic or to another doctor. For instance a patient might be referred to the clinic by another doctor living in the surrounding territory, and when leaving, the patient would pay his entire bill by one check. After depositing the check it would be necessary for the plaintiff to write checks paying the hospital-clinic and the other doctor the respective portions of the fee owing to each. Plaintiff also maintained a safety deposit box but kept no cash there. Plaintiff handled all financial matters through his bank account. All income was deposited there and all payments of any consequence were made by check. He obtained a bank statement at the end of each month and it was his practice to compare the statement with his check stubs, which were studiously and carefully filled out on each check written. He was very careful to keep an accurate account of his bank balance. For instance, his wife and daughter wrote individual checks during the month on the account, and at the end thereof he would total the amount of checks written by them and subtract this total from the balance shown by his check stubs. Also, on several occasions he would have the bank clarify errors in deposits reflected by the statement, as when a deposit was shown on his statement when it should have appeared to the credit of the clinic. The various real estate transactions mentioned above were consummated by his personal check. All in all his bank account records disclosed an extremely accurate picture of his financial condition,

income and expenditures over the period in question.

### 3

At the end of each year in question the plaintiff calculated his gross income from his practice by totaling the entries in his log book, previously referred to, and adding thereto his outside income, such as rents, State Board of Medical Examiners salary, etc. These totals were handed to Mr. Smith Henley, an attorney at Harrison, who, from the figures given him, computed plaintiff's income tax. Plaintiff's books and records were not turned over to Mr. Henley.

### 4

Mr. B. M. Lindsey, Internal Revenue Agent, and Mr. Francis B. Reynolds, Special Agent, Intelligence Unit, Bureau of Internal Revenue, conducted an investigation of plaintiff's records in 1949 to check the correctness of his income tax returns for the years 1944, 1945, 1946 and 1947.

They used the bank account method in making the investigation, and due to the manner in which plaintiff had kept his bank account records, previously discussed, their task was a comparatively simple one. They checked all deposits, expenditures, expenses and investments item by item in determining his net income and deductions. Plaintiff made his other records, such as check stubs, office records, etc., available to them when advised of the investigation. It was found that plaintiff had understated his net income from 100% to 300% each year, and that for each year there had been a similar understatement of his allowable deductions. Also, it was shown that plaintiff's investments during each year involved exceeded the amount of his reported net income for each year. In arriving at their final figures plaintiff was given all deductions which were proper.

The following figures reveal the results of their investigation and calculations:

| Period | Deductions | |
| --- | --- | --- |
| | Deductions per return | Deductions as adjusted |
| 1944 | $ 7,367.31 | $10,934.54 |
| 1945 | 8,811./1 | 24,016.94 |
| 1946 | 11,989.95 | 26,046.98 |
| 1947 | 11,207.76 | 23,731.91 |

| | Net Income | | |
| --- | --- | --- | --- |
| Period | Per Return | Corrected | Unreported |
| 1944 | $13,776.69 | $31,489.44 | $17,712.75 |
| 1945 | 15,530.29 | 34,387.88 | 18,857.59 |
| 1946 | 11,901.05 | 23,655.13 | 11,754.08 |
| Totals | $51,989.27 | $119,670.37 | $67,681.10 |

| | Income Tax | | |
| --- | --- | --- | --- |
| Period | Per Return | Corrected | Unreported |
| 1944 | $ 3,713.44 | $13,833.13 | $10,119.69 |
| 1945 | 4,508.93 | 15,728.76 | 11,219.83 |
| 1946 | 2,652.78 | 8,046.41 | 5,393.63 |
| 1947 | 2,275.84 | 11,756.73 | 9,480.89 |
| Totals | $13,150.99 | $49,365.03 | $36,214.04 |

| | Deficiencies & Penalties | | |
| --- | --- | --- | --- |
| Period | Deficiency | Fraud | Deficiency & Penalty |
| 1944 | $10,119.69 | $ 5,059.85 | $15,179.54 |
| 1945 | 11,219.83 | 5,609.92 | 16,829.75 |
| 1946 | 5,393.63 | 2,696.82 | 8,090.45 |
| 1947 | 9,480.89 | 4,740.45 | 14,221.34 |
| Totals | $36,214.04 | $18,107.04 | $54,321.08 |

After the two agents had finished their work they advised the plaintiff of their conclusions, and thereafter plaintiff had his attorney verify the same. After this was done and several conferences were held, the plaintiff agreed to the correctness of the deficiency assessments. At this point it might be set forth, although it is of no real significance in resolving the issue before the court, that the plaintiff signed a waiver of restrictions on assessment and collection of deficiency in tax. Comparatively speaking, a considerable amount of testimony was introduced concerning the circumstances and certain statements in connection with the signing of this waiver. The waiver binds no one in this proceeding, and is simply a means whereby the taxpayer may waive certain restrictions as to notice, etc., as provided in Section 272(a) of the Internal Revenue Code, 26 U.S.C.A.

Concerning his failure to accurately report his income, plaintiff testified that it was due to the stress of work and inexperienced help and, while admittedly negligent on his part, was in no wise willfully or deliberately done to evade tax. As his figures on gross income were taken from his log book, the only explanation that he offered for the large discrepancy between reported and actual income was that collections in that amount were not entered on the daily pads and, therefore, were not recorded in the log book.

### 5

Thereafter, plaintiff paid the respective amounts of additional assessments plus interest as set forth above, which payments were duly received and credited and concerning which there is no dispute here.

Also, plaintiff paid the 50% fraud penalty assessments in the total amount of $18,107.04, the amounts for the individual years involved being as set forth above, which payments were duly received and credited, and which payments are the basis of this lawsuit.

### 6

Plaintiff filed claims for refund, received by the Collector November 8, 1949, for each of the years in question in the following amounts. It will be noted that the amounts sought by way of refund are the amounts of the 50% fraud penalty assessment less the 5% negligence penalty, which is admitted to be owing by the plaintiff.

| Period | Amount of Refund Claimed |
| --- | --- |
| 1944 | $ 4,553.87 plus 6% interest from Oct. 12, 1949 |
| 1945 | 5,048.93 plus 6% interest from Oct. 12, 1949 |
| 1946 | 2,427.14 plus 6% interest from Oct. 12, 1949 |
| 1947 | 4,266.40 plus 6% interest from Oct. 12, 1949 |
| TOTAL | $16,296.34 |

By registered letter dated February 13, 1950, the above claims for refund were denied. Therefore, plaintiff has duly exhausted his administrative remedy.

Thereafter, this suit was filed in this court on August 8, 1950, under Title 28, U.S.C. § 1346, since the amount of the claim for each year does not exceed $10,000.

### 7

So meticulous was the plaintiff in keeping a correct record of his bank account as reflected by his check stubs, that he could have ascertained at any time the exact amount on deposit against which checks had

been drawn, with the possible exception of checks for various small amounts that might have been drawn by his wife or daughter and were outstanding, but at no time were these checks of any magnitude when compared with the money on hand to pay the checks.

8

The court has personally examined some of the check stubs which were introduced in evidence, and while the testimony of the witness B. M. Lindsey as to the amount of the yearly deposits has not been completely verified by personal examination of the check stubs by the court, the examination so made is convincing that the check stubs reveal that plaintiff deposited in his bank the amounts testified to by that witness, to wit:

> 1944 — $47,423.98
> 1945 — 78,087.32
> 1946 — 50,777.61
> 1947 — 64,869.83

The investments made from time to time over the period involved exceed the amount of net income reported by the plaintiff, and while the testimony does not reveal the source of the income that was not reported by the plaintiff, yet, it is undisputed that the computation made by the agents of the Government is a correct statement of the amount of income. The plaintiff in his testimony intimated that the additional income must have been derived from his medical practice and that it was not reported because some one failed to enter the amounts on the daily tab records, but regardless of the source of the additional income, the plaintiff knew at the end of every calendar year he had deposited a large sum of money and he must have known that if his deductions as reported by him were anything like correct, his net income was far larger than that reported.

The plaintiff's conduct in zealously attending his patients with marked ability is indeed commendable but notwithstanding the time devoted by him to his profession he found time to keep a careful record of all the money deposited by him in his bank account. He does not deny that he knew the source of all of this money and, of course, he was familiar with the necessary expenses incurred in the practice of his profession.

The explanation offered by the plaintiff to the effect that the discrepancy between the reported and the actual income arose because collections were made that had not been entered on the daily pads and thus transferred by him to the log book is not satisfactory or convincing.

No testimony was introduced by either plaintiff or the defendant to show the exact source of this discrepancy since the plaintiff agreed that the returns as corrected by the agents of the defendant reflected the true amount of his income. If the discrepancy had arisen by a failure to report income from rents or interest on investments this would doubtlessly have been shown to be an oversight. In the absence of such a showing, it appears to the court that the discrepancy must have arisen because of plaintiff's failure to report the income from his practice and it should be borne in mind that the only income reported from that practice was the sums entered in his log book by him from the daily pads which showed the amount paid in cash by the patients when the professional service was rendered. No effort was made to show the amount of the deferred charges or amount received from past due accounts.

The plaintiff did not reveal to any one his books and records in order that his correct income might be ascertained until the investigation was started, but gave to his attorney only what the daily pads as copied by him in his log book reflected.

## Discussion.

The ultimate question before the court is whether admitted deficiencies for the years 1944, 1945, 1946 and 1947 were due to "fraud with intent to evade tax" within the meaning of Title 26, U.S.C.A. § 293(b). The legal standards applicable to a determination of the general question are comparatively clear, but of necessity each case must be considered in the light of its particular facts, and the various reported cases are important only to the extent that their facts approximate the facts of the instant case.

A mere reading of the facts, as set forth above, amply reveals the lack of merit in plaintiff's case, but in deference to the plaintiff and his able attorneys, the court feels that a discussion of the reasons that prompted it to reach its decision is appropriate.

The burden is upon the United States to establish fraud. 26 U.S.C.A. § 1112. And, "The fraud meant is actual, intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing". Mitchell v. Commissioner, 5 Cir., 118 F.2d 308, 310; Wiseley v. Commissioner of Internal Revenue, 6 Cir., 185 F.2d 263, 266. Also, "Fraud cannot be lightly inferred, but must be established by clear and convincing proof". Rogers v. Commissioner, 6 Cir., 111 F.2d 987, 989.

There being nothing in the applicable statutes to the contrary, it must be accepted that the Congress intended fraud as ordinarily understood in the law, and while, as stated above, clear and convincing proof is necessary, this standard may be satisfied by circumstantial evidence. As expressed in White v. United States, D.C.W.D.Ky., 20 F.Supp. 623, 625:

"The word 'fraud' is not defined in the act, and it is to be construed as ordinarily understood.

" * * * If there has been deliberate suppression of vital facts in the return, which is misleading, it is a fraud, and the misrepresentation will support fraud penalties if made recklessly without knowledge, or if so carelessly done as to lead a trier of facts to believe that the person on whom the duty rests to disclose has knowingly or intentionally failed to do what the law requires.

"A charge of fraud cannot be sustained unless it is shown that the person charged had in his mind the intention to deceive another, but the intention may be inferred from the consequences of the act. If a person tells a willful falsehood with the intention that it shall be acted upon by the person to whom he tells it, his mind is plainly wicked and he must be said to have acted fraudulently. Again, fraud may be inferred if a person makes a statement recklessly, intending it to be acted upon, without regard to its truth or falsity."

And, in Battjes v. United States, 6 Cir., 172 F.2d 1, 5 (a criminal case) the court said: "Direct proof of willful intent is not necessary. It may be inferred from the acts of the parties, and such inference may arise from a combination of acts, although each act standing by itself may seem unimportant. It is a question of fact to be determined from all the circumstances. (Citing cases)"

An established legal guide in the determination of "intent" is that " 'every man is presumed to intend the natural and necessary consequences of his acts' ". United States v. Harter, 7 Cir., 116 F.2d 51, 56.

In view of the plaintiff's subsequent admission of the correctness of the corrected returns and the deficiency assessments, certain of the essential elements necessary to label a transaction as fraudulent are not in controversy. Thus, it is clear that plaintiff's original returns, filed by him for the years in question, constituted false statements of material facts, which were justifiably relied upon by the defendant to its damage. Every person knows that "The federal income tax system is one of self-assessment by the taxpayer" and "Its efficiency must depend largely on the truth of facts set out by the taxpayer in his return". Halle v. Commissioner of Internal Revenue, 2 Cir., 175 F.2d 500, 502.

Therefore, the real controversy in this case centers upon a determination of whether the facts of this case sufficiently show the remaining elements, (1) false statements or misrepresentations which were "knowingly made", and (2) made with "intent to evade tax".

Concerning "knowledge", Restatement of Torts, Sec. 526 provides that:

"A misrepresentation in a business transaction is fraudulent if the maker

"(a) knows or believes the matter to be otherwise than as represented, or

"(b) knows that he has not the confidence in its existence or non-existence asserted by his statement of knowledge or belief; or

628

"(c) knows that he has not the basis for his knowledge or belief professed by his assertion."

And, in Comment (e) thereunder, it is stated: "In order that a misrepresentation may be fraudulent it is not necessary that the maker know the matter is not as represented. Indeed, it is not necessary that he should even believe this to be so. It is enough that being conscious that he has neither knowledge nor belief in the existence of the matter he chooses to assert it. Indeed, since knowledge implies a firm conviction, a misrepresentation of a fact so made as to assert that the maker knows it, is fraudulent if he is conscious that he has merely a belief in its existence and recognizes that there is a chance, more or less great, that the fact may not be as it is represented. This is often expressed by saying that fraud is proved if it is shown that a false representation has been made without belief in its truth or recklessly, careless whether it be true or false."

A careful consideration of the testimony has convinced the court that the original returns contained false statements and misrepresentations which were "knowingly made". There is the exceedingly large discrepancy between reported income and actual income, varying from 100% to 300%; there was the consistent practice of understating both net income and allowable deductions. The plaintiff is an intelligent man engaged in a skilled profession, and one who exercised meticulous care in the handling of his finances, as evidenced by the status of his bank account records; at all times he had in his possession records from which he, or an accountant or attorney, could have rather easily determined his correct income, and he never used all such available records nor turned them over to his attorney to use. His investments each year exceeded the amount of his reported net income.

The court is not unmindful of the contention of the plaintiff that he was too busy to accurately record all collections from his profession and that he was unable to retain capable help to do so. Plaintiff relies upon the case of Wiseley v. Commissioner of Internal Revenue,

supra, in support of this contention. Indeed the complaint in the instant case is very similar to the facts in the Wiseley case, but a comparison of the facts established by the evidence discloses a wide difference and the two cases can and must be distinguished on their facts. In the Wisely case the years involved were all war years, his help was inexperienced, and he "realized that until he could make amended returns he was in difficulty with his taxes". [185 F.2d 266.] As soon as possible he secured help from certain industrial friends, who placed their personal auditors on his books, and he filed amended returns. Also, it appears that the taxpayer scarcely ever wrote checks and never kept himself advised as to his accounts. Here only two of the years involved were war years, no amended returns were filed, and only after an investigation was started did the plaintiff show any interest in correcting the situation. At that point he made all records available to the investigators, but under the circumstances, that was the only thing he could do. Furthermore, unlike Dr. Wisely, plaintiff was exceedingly careful with respect to his financial affairs and conducted his affairs almost exclusively by check. His correct income could have been ascertained at any time with comparative ease from an examination of his check stubs and bank records either by himself or by his attorney, had he seen fit to make all records available to his attorney.

It is the total picture that is conclusive, and the court wishes to emphasize that it is not resting its conclusion solely on the fact that the deficiencies were large, recognizing that this within itself does not establish as a matter of law that plaintiff was guilty of fraud. From all of the facts and circumstances the court is of the opinion that the defendant "knowingly made" the false statements and misrepresentations in his returns for the years involved.

As to "intent to evade tax", the court believes that the only possible inference from the facts of this case is that under our system of self-assessment, the plain-

tiff, by filing false returns and taking no further action to correct them or to advise of their probable falsity, intended for the Commissioner to accept and rely on the returns for what they purported to be, accurate statements of his income and tax due for the years reported. Having knowingly made false returns, it must be presumed that he intended the natural and necessary consequences of his acts, that is, the payment of the amount of tax set forth therein and an evasion of the tax actually due. On the question of intent one contention of the plaintiff should be mentioned. It is urged that the fact that all income was openly deposited in the bank indicates no intent to evade tax. The advisability of a taxpayer using a bank rather than a secret hiding place for his money when attempting to evade income tax may be questionable, but the important thing about plaintiff's banking practices, as viewed by the court, is that such practices when considered with the other facts and circumstances convince the court that plaintiff knew he was not correctly reporting his income. And, as pointed out above, when he knowingly made false returns, it necessarily follows under the facts of this case that this was done with "intent to evade tax". These facts show considerable more than mere negligence or carelessness. To be most charitable, the facts convince that the plaintiff in making his returns was "recklessly, careless whether it be true or false".

In reaching this conclusion the court is mindful of the nature of these additions to the tax. As expressed by the Supreme Court in Helvering v. Mitchell, 303 U.S. 391, 401, 58 S.Ct. 630, 634, 82 L.Ed. 917: "The remedial character of sanctions imposing additions to a tax has been made clear by this Court in passing upon similar legislation. They are provided primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation and the loss resulting from the taxpayer's fraud."

There is no doubt but that the plaintiff and others similarly situated during a part of the time involved herein worked long hours in administering to the sick and the afflicted. His fidelity to his chosen profession is commendable and no doubt he gave first consideration to the demands and requirements of his patients but, notwithstanding this, he found time to laboriously transfer in long hand from the daily tabs to his log book the daily charges to his patients and payments made by them. He knew or could ascertain at a glance the amount of cash collected by him each and every month. Likewise he knew the amount of money deposited by him in the bank each and every month and was bound to have known that the amount deposited greatly exceeded the amount reflected by the log book. No doubt he gave some time to his duties as director in a bank and had more information than the average person has of the status of his own finances. Had he used a reasonable degree of care in reporting his income, his claim would have stood on an entirely different basis. There was available to him a full knowledge of the amount of his income, yet he recklessly represented in making his returns that they were correct. Under these circumstances it can hardly be doubted that the plaintiff knowingly and intentionally failed to do what the law required of him. There is no doubt but that he intended the Government to accept the returns as made by him and there does not appear from the facts in the case any doubt that these returns were made recklessly and without the proper regard for their correctness.

The facts in the case are such that the plaintiff must bear the consequences of his acts.

### Conclusions of Law.

#### 1

The court has jurisdiction of the parties and of the subject matter of this case. Title 28, U.S.C.A. § 1346.

#### 2

■ The admitted deficiencies in plaintiff's income tax for the years 1944, 1945, 1946 and 1947 were due to "fraud with intent to evade tax" within the meaning of Title 26, U.S.C.A. § 293(b), and, there-

fore, the 50% additional assessments authorized by Sec. 293(b) were properly assessed and collected by the Commissioner of Internal Revenue.

### 3

Therefore, in accordance with the above, judgment in favor of the defendant should be entered, in which costs should be assessed against the plaintiff.