**Lucian M. BUKOWSKI, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. 8132.**

United States District Court
S. D. Texas, Houston Division.

Aug. 31, 1955.

---

3. McKeever v. Fontenot, 5 Cir., 104 F.2d 326.

4. Republic Oil Refining Co. v. Granger, 3 Cir., 198 F.2d 161.

Walter E. Barton, Washington, D. C., and Jos. M. Block, Houston, Tex., for plaintiff.

Malcolm R. Wilkey, U. S. Atty., Houston, Tex., Carrington Williams, Tax Division, Washington, D. C., and Carlos G. Watson, Jr., Asst. U. S. Atty., Houston, Tex., for defendant.

CONNALLY, District Judge.

This is an action to recover deficiencies in income tax, fraud penalties, and interest for the calendar years 1940–1943, inclusive, and fraud penalties alone for calendar 1944 and 1945. All jurisdictional requirements have been met, and are the subject of stipulation. The action was tried to the Court without the intervention of a jury.

The plaintiff is a physician and surgeon who has been practicing his profession in this City since June, 1939. Conceding now that his income tax returns for each of the years in question understated his income in material degree, and admitting the inadequacies and inaccuracies of his books and records, plaintiff contends that his mistakes resulted from the inexorable demands of an exceedingly heavy medical practice during the years of World War II, and to the inefficient office help which he was able to procure; or, at worst, that it resulted from negligence or good-faith errors or omissions in bookkeeping on his part.

The Government contends, on the contrary, that the deficiency was "due to fraud with intent to evade tax," as provided in Title 26 U.S.C.A. § 293(b), and that the 50 per cent fraud penalty thereby provided was properly collected from the plaintiff. For the years 1940 to 1943, the deficiency assessment admittedly was barred by the statute of limitations, 26 U.S.C.A. § 275(c), in the absence of fraud. If fraud be present, then the assessment was timely, 26 U. S.C.A. § 276. The assessment of the penalties alone is involved for 1944 and 1945. Thus, the single issue of whether the deficiency was due to "fraud with intent to evade tax" on the part of the taxpayer for each of the years in question is determinative of the entire case.

By reason of the inadequacies of the plaintiff's records, the Internal Revenue Agents investigating his case calculated his income by the net worth method. A calculation was made of plaintiff's net worth as of the beginning of the period in question, and as of December 31 of each year thereafter. The annual increase in the taxpayer's net worth, plus estimated living expenses and perhaps other expenditures, was then adopted as taxpayer's income for such year. With minor exception, plaintiff admits the accuracy of the Government's figures. They are in substantial accord with a similar net worth calculation made by accountants on his behalf. The plaintiff's income, as reflected by his income tax return, and as computed on the net worth basis for the years in question, is shown by the following table.

| Year | Per Return | As Corrected By Commissioner |
|------|------------|------------------------------|
| 1940 | $3,317.60 | $13,080.90 |
| 1941 | 4,709.85 | 9,068.69 |
| 1942 | 4,066.50 | 16,659.03 |
| 1943 | 5,886.26 | 15,192.02 |
| 1944 | 6,964.28 | 10,228.75 |
| 1945 [1] | 7,874.10 | 18,000.74 |

The plaintiff has testified at length in undertaking to explain these repeated and long continued deficiencies. His testimony was as follows.

Plaintiff was born in 1911, one of a number of children, with parents in modest though comfortable circumstances. He was exceedingly industrious and thrifty from a very early age, and throughout his elementary and intermediate school years held various types of employment. He completed college in this City in 1931, and at this point in his career had accumulated approximately $8,000 in savings. This money was in currency and was secreted in or around his home by his parents.

Plaintiff attended Baylor Medical School, in Dallas, Texas, 1931–1935.

During the four years, plaintiff has testified that he likewise worked most diligently and assiduously. Beside the rigorous curriculum of his medical studies, he was able to hold five different jobs, working in a cafe or drug store for his meals, selling his blood as a professional donor, and working frequently as a male nurse on night duty, etc. Aside from some inconsequential financial assistance from his parents, he not only earned all of his expenses, but was able to save and lay aside an additional $4,000 to $5,000. Thus, on completion of medical school, he had savings of some $12,000 to $13,000, all maintained, as stated above, in currency, and secreted (at locations which he could not recall) in and around his and his parents' residence. The plaintiff was by this time 23 years of age.

During 1935 to 1939, plaintiff served his internship and residency at Jefferson Davis Hospital, this City. This is a large charitable institution maintained by the City and County. During his four years of service at the hospital, plaintiff's salary, in addition to his room, board, and laundry, was $25 per month, $50 per month, $100 per month, and $130 per month, respectively. During these four years, plaintiff has testified he was able to save and lay aside an additional $4,000 to $5,000 in savings, which he secreted in a small strong box in his intern's quarters at the hospital. It being pointed out to plaintiff on cross-examination that the $4,000 of savings exceeded his total salary for the years in question, without any consideration being given to his personal expenses, maintenance of his automobile, etc., he testified that he received frequent and sizable gratuities from patients whom he attended in the hospital, which made up the difference.

On beginning the practice of medicine in 1939, plaintiff maintained an office with two other physicians. A single

1. Plaintiff married in September, 1941, and for the years 1942–1945, inclusive, only one-half of the annual increase in net worth was taxed to plaintiff, as the full increases were treated as community income.

secretary-office nurse (Mrs. Rawls) served all three. She maintained plaintiff's records, which consisted of a "day book" in which notations were made of the visit of each patient, charges, etc. These notations thereafter were transferred into a permanent ledger. A receipt book was maintained, with a carbon copy of each receipt remaining in the book. During the early months, plaintiff's practice was not heavy. It improved somewhat in 1940 and more so in 1941. During 1942, he averaged about 25 to 30 patients per day. Thereafter, during 1943 to 1945, inclusive, his practice expanded tremendously. Plaintiff's normal charge for an office visit during the early years of his practice was $2. This was increased to $3 about the beginning of 1943. Plaintiff estimated his earnings from the practice of his profession for 1941 at $12,000 to $15,000; for 1942, at $18,000 to $20,000; and testified unequivocally that, in his best judgment, by 1942 he had saved approximately $30,000 from the practice of his profession, over and above his living and office expenses. So by 1942, his savings amounted to approximately $45,000.

During this period, plaintiff made several changes in his routine which are of interest here. He took a suite of offices alone (1941), and employed a new secretary-nurse (Mrs. Cruikshank, June, 1940), who assisted Mrs. Rawls until the latter's departure (June, 1941), and adopted a simpler method of bookkeeping. A large "history card" was prepared for each patient, and aside from the notations made professionally, the card was also used to show the number of visits, the charges made, any payments received, etc. The practice of giving receipts, with a retained copy, was continued. Mrs. Cruikshank left plaintiff's employ about January, 1943, and was replaced by Miss Hughes. She continued with him throughout the period in question.

By the beginning of 1943, and continuing through 1945, plaintiff has testified that he averaged from 75 to 110 patients per day. In addition to normal office hours, he saw patients on Friday nights and frequently on Sundays. He practiced surgery in the mornings before office hours, and averaged, by his estimate, from 3 to 4, to sometimes 7 or 8 operations per week. The surgeon's fees in these cases were from $50 to $150. When payment was made to the plaintiff for his professional services, he simply put the money in his pocket. If payment was made to the secretary, she followed the practice of delivering it to him at the first convenient time. Checks, as well as cash, were so handled. When the accumulations of cash in his pocket became too large, plaintiff would hide large amounts of currency around his home.

At intervals which he has estimated at from 10 to 16 days, plaintiff personally made deposits to one or more of his several bank accounts. He would carry his currency and checks in a paper sack. As an accommodation to and at the request of the bank tellers (so plaintiff testified), he invariably took his funds first to one teller who cashed the checks, so that plaintiff had all currency in his possession. Then, going to other tellers, he deposited only currency in his accounts. He held a safety deposit box at the bank, and visited it frequently, but never kept cash there. These biweekly deposits usually amounted to several thousand dollars.

Plaintiff's income tax returns for 1940 and 1941 were prepared by a now-deceased Internal Revenue Agent from information which plaintiff furnished. From 1942 to 1945, inclusive, such returns were prepared by plaintiff's brother, a businessman of this City with some experience in such matters. Plaintiff considered that his receipt book fully and accurately reflected his entire income from the practice of medicine, and hence delivered his receipt book to these parties who actually prepared his returns with that advice. He was confident that this was so because he had instructed each of his secretaries invariably to give a receipt to each paying

patient. He always thought they had done so.

Plaintiff's testimony was not corroborated in several material particulars, and was impeached in other respects by other witnesses. Both Mrs. Rawls and Mrs. Cruikshank testified that they had received no instructions from plaintiff invariably to issue receipts from the receipt books, or that the receipt books were to be the single, final record maintained with scrupulous accuracy for income tax purposes. Receipts normally were issued when payment was made in cash, or when requested by the patient. There was no practice of mailing receipts to those patients who sent checks through the mail. In fact, Mrs. Cruikshank received her instructions as to such office routines from Mrs. Rawls. She did not recall plaintiff ever having discussed the bookkeeping practices with her. From the demeanor and appearance of these two witnesses on the stand, I am convinced that their testimony is entitled to full credence, and that plaintiff did not want for efficient and competent secretarial help while either or both were in his employ (June, 1939, to January, 1943).

The brother, B. C. Bukowski, testified that plaintiff had delivered the receipt books to him as the full, true and accurate record of all of his professional income; the witness had accepted it as such, and completed the returns on that assumption. No one had told him anything of any other records or of the inaccuracies of the receipt books.

There are a number of inconsistencies between plaintiff's testimony here and a statement which he made under oath to the Revenue Agents in 1947.

Recognizing that fraud in this character of case must be established by clear and convincing proof, Rogers v. Commissioner, 6 Cir., 111 F.2d 987; Jemison v. Commissioner, 5 Cir., 45 F. 2d 4; Owens v. United States, D.C., 98 F.Supp. 621, affirmed 8 Cir., 197 F.2d 450, that fraud, as used in the statute, means an actual and deliberate wrongdoing with a specific intent to evade a tax believed to be owing, Mitchell v. Commissioner, 5 Cir., 118 F.2d 308; Wiseley v. Commissioner, 6 Cir., 185 F. 2d 263; and that the burden to establish such fraud is upon the Government, Ohlinger v. United States, 9 Cir., 219 F.2d 310; Hargis v. Godwin, 8 Cir., 221 F.2d 486; Owens v. United States, supra, I am able to arrive at no conclusion other than that plaintiff knew full well for each of the years in question that his taxable income was far in excess of the figure which he reported; and that the deficiencies shown by his returns resulted from a deliberate attempt on his part to evade the additional taxes which he knew to be due. This is fraud, as used in the statute.

Plaintiff's testimony I find uncertain and evasive; it is incredible in some particulars; and on the whole, entirely unconvincing. His testimony as to the large amounts of savings as a school boy, as a medical student, and as an intern, in large part during the depression years of the 1930's, causes me to view his position with some skepticism. The further testimony as to large sums of money remaining hidden around the house and uninvested for many years, first appearing for investment (and with apparent rare success and good judgment) in the 1940's, causes further skepticism. But the skepticism is replaced by incredulity at plaintiff's testimony explaining his deficiencies for 1943–1945. It being called to his attention on cross-examination that he obviously was aware of his heavy practice, and of his large income; that he personally handled and deposited receipts in the amount of several thousand dollars every few weeks; that he must have been aware of the continued and rapid growth of his bank accounts, his securities and real estate investments; and under these circumstances, when inquiry was made as to how, in good conscience, he could return figures showing an income of only some six to eight thousand dollars for each of those

years, his answer was, "I just didn't take time to read over the returns". From a highly intelligent, well educated, and eminently successful professional man, this simply will not do. Come the ides of March, a taxpayer in performing his duty as a citizen in assessing his own taxes may not close his eyes to facts with which he is confronted daily, and, on being called to account, escape the consequences by saying, "I didn't take time to read it over".[2]

Attention is invited to the able and exhaustive treatment afforded the questions raised here by Judge Miller of the United States District Court for the Western District of Arkansas in Owens v. United States, D.C., 98 F.Supp. 621, affirmed 8 Cir., 197 F.2d 450. On facts and pleadings in all material respects parallel to those before me, the Court there reached similar findings. I forego any further discussion of the issues by referring to the opinion of Judge Miller, with which I find myself in full accord.

The foregoing is adopted as Findings of Fact and Conclusions of Law. In addition thereto, I refer to and adopt the stipulation and supplementary stipulation of the parties, as a part of the Findings of Fact.

The plaintiff is not entitled to recover, except in so far as recovery may be warranted by the error in calculation on the part of the Government referred to in the supplemental stipulation.

Counsel for the Government will prepare decree in conformity with the foregoing, submit same to opposing counsel for approval as to form, and forward to the Court within twenty days.

2. The meticulous care with which plaintiff's business *expenses* are listed in each return (sometimes in his own handwriting) would indicate that he was able to maintain accurate records in that regard. Many expenses of a frequently recurring nature are enumerated (office supplies, stationery, stamps, etc.). Many are listed of inconsequential amount ("narcotic fee * * * $1.00; freight and express charges * * * $1.87 (1945); State registration fee * * * $2.00; Federal use stamp motor vehicle * * * $2.50 (1942)," etc.). His deduction of personal expenses while attending medical meetings, the claimed depreciation on professional equipment, books, auto, etc., indicate plaintiff was not entirely unfamiliar with at least some aspects of completing his income tax return.