Joseph E. **RIES** and Charlotte **Ries**, James A. Ries, Administrator of the Estate of Theresa Ries, and Charlotte Augustine Ries, Executor of the Estate of Charles A. Ries, Plaintiffs,

v.

**UNITED STATES of America, Defendant.**

Civ. A. No. 21609.

United States District Court
E. D. Pennsylvania.

April 23, 1959.

Stephen B. Narin and Harold B. Lipsius, Philadelphia, Pa. (of Ehrlich, Narin & Garfinkel), Philadelphia, Pa., for plaintiffs.

Arthur L. Biggins, James P. Garland and Lyle M. Turner, Department of Jus-

tice, Washington, D. C., Charles K. Rice, Asst. Atty. Gen., Harold K. Wood, U. S. Atty., and Norman C. Henss, Asst. U. S. Atty., Philadelphia, Pa., for defendant.

STEEL, District Judge.

The sole issue is whether fraud penalties assessed and paid under § 293(b) of the I.R.C. of 1939 should be refunded [1]. The income tax deficiencies upon which the penalties are based have been paid and no recovery of them is sought. Jurisdiction rests upon 28 U.S.C. § 1346(a) (1).

During 1947 through 1950 inclusive, Charles A. Ries (herein "Charles") and Joseph E. Ries (herein "Joseph") were equal partners in a business engaged in buying, reconditioning and selling barrels. Charles and Joseph filed individual income tax returns for 1947, and joint returns with their wives for 1948, 1949 and 1950. Plaintiffs are Joseph, his wife, and the executor and administrator of the estates of Charles and his wife, respectively, the latter two persons having died in 1956 and 1953. Charles, Joseph and their wives are referred to as the taxpayers.

The income tax deficiencies resulted from alleged understatements of distributable income of the partnership. As a result of Government audit the distributable partnership income reported by the taxpayers was increased by $17,190.57 for 1947, $22,103.61 for 1948, and $28,249.82 for 1950, and was decreased by $3,728.20 for 1949. Principally because of these changes, the following income tax deficiencies were assessed:

|                  | 1947       | 1948      | 1950      |
|------------------|------------|-----------|-----------|
| Charles          | $3,345.64  |           |           |
| Joseph           | $3,097.01  |           |           |
| Charles and wife |            | $1,387.10 | $2,908.32 |
| Joseph and wife  |            | $1,259.38 | $2,897.30 |

In addition, the following civil fraud penalties of 50 percent of the deficiencies were added to the tax:

|                  | 1947       | 1948      | 1950      |
|------------------|------------|-----------|-----------|
| Charles          | $1,672.82  |           |           |
| Joseph           | $1,548.51  |           |           |
| Charles and wife |            | $ 693.55  | $1,454.16 |
| Joseph and wife  |            | $ 629.69  | $1,448.65 |

█ █ █ In an action in a District Court for a refund of a fraud penalty, the burden of proving fraud is on the Government. Trainer v. United States, D.C. E.D.Pa.1956, 145 F.Supp. 786, 787 and authorities therein cited. The order of May 7, 1957 entered by Judge Kirkpatrick in this cause so provides; and the Government concedes that this is the rule of the case at this juncture. The fraud must be established by evidence which is clear and convincing. Bukowski v. United States, D.C.S.D.Tex.1955, 136 F.Supp. 91, 95; Powell v. Granquist, 9 Cir., 1958, 252 F.2d 56, 61. The same burden and *quantum* of proof is ap-

1. Section 293(b) provides:
   "*Fraud.* If any part of any deficiency is due to fraud with intent to evade tax, then 50 per centum of the total amount of the deficiency (in addition to such deficiency) shall be so assessed, collected, and paid, in lieu of the 50 per centum addition to the tax provided in section 3612(d) (2). 53 Stat. 88." 26 U.S.C. § 293(b).

plicable in a proceeding before the Tax Court when civil fraud is in issue. Valetti v. Commissioner, 3 Cir., 1958, 260 F.2d 185, 188. To warrant the imposition of a civil fraud penalty, a taxpayer must have engaged in an act of intentional wrongdoing with the specific purpose of evading a tax believed to be owing. Powell v. Granquist, supra, 252 F.2d at page 60; Wiseley v. Commissioner, 6 Cir., 1950, 185 F.2d 263, 266; Mitchell v. Commissioner, 5 Cir., 1941, 118 F.2d 308, 310.

■ The Government attempts to make much of the fact that the partnership reported total distributable income of only $18,000 for the years 1947 through 1950, whereas after audit this was increased to $82,000. The Government says that this determination of a 500 percent increase in the partnership distributable income, and the taxpayers' acceptance of this determination by their execution of Form 875, establishes the fact that the taxable incomes had been substantially understated over a period of years, and that under Schwarzkopf v. Commissioner, 3 Cir., 1957, 246 F.2d 731, 734, this circumstance, in and of itself, is sufficient to sustain the commissioner's finding of fraud [2].

This argument is based upon a misconception of the evidence and the law.

While at the trial the taxpayers stipulated to the amounts by which the distributable income of the partnership was increased by the audit, in doing so they made it clear that they did not agree that the amount of the increase was correct. This qualification of the stipulation was accepted by the Government. In the Valetti case it was held that an adjudication by the Tax Court of income tax deficiencies over a four-year period signified only that the taxpayers were unable to overcome the presumption of correctness which the law accords to tax deficiency findings by the Commissioner; and that such findings are not enough in and of themselves to support a fraud finding which the Commissioner has the burden of proving. The Commissioner's findings of income tax deficiencies and the acceptance thereof by the taxpayers in the case at bar can have no greater effect.

Schwarzkopf holds that the proven failure of a taxpayer to report as income $200,000 received over a five-year period is enough, without more, to establish a fraudulent intent to evade the payment of taxes. In the case at bar the Government makes no contention that the taxpayers have failed to report income which they received; and although it asserts that 50 percent of the payments claimed by the taxpayers as deductions

2. Form 875 reads:
   "Phila., Pa. Division. Collection District ....................
   "Acceptance of Revenue Agent's Findings By A Partnership or Fiduciary
     "The partnership named below has reviewed the recommendation of Revenue Agent Louis J. Ducsik covering an investigation of its return(s) of income, within discloses for the ............
   year ended 12/31/47—increase in income of $17,190.57
   year ended 12/31/48—increase in income of $22,103.61
   year ended 12/31/49—decrease in income of ($3,728.20)
   year ended 12/31/50—increase in income of $28,249.82
   and the distribution of the total income as corrected. The findings of the revenue agent are hereby accepted.
                                    "(Signed) Joseph A. Ries
                                     (Address illegible)
                                     By Charles A. Ries
   June 16, 1952"

for the purchase of barrels were in fact never made, the evidence falls far short of establishing this with the persuasive force which the law exacts when fraud is claimed.

During the four years in question, the partnership paid for its barrels by check and by cash. The cash payments totaled approximately $100,000. These payments were shown by the stubs of the checks which were cashed to obtain the funds used in the cash transactions. The stubs did not reflect the names of the persons to whom the payments were to be made [3].

Although the partnership kept a rather complete set of books, the books and records pertaining to the cash purchases were missing when the Government made its audit. These records had been kept by Charles who bought the barrels. When the Revenue Agent asked Charles to name the persons to whom the cash had been paid, Charles refused. He said that such a disclosure "would ruin the business" and that it "would be against the business" because "people don't want their names pushed out" [4]. Prior to trial, Charles died. Joseph likewise failed to divulge, during the audit, when his pre-trial deposition was taken by the Government, and at the trial, the names of suppliers to whom cash had been paid. He testified on deposition and at the trial that he didn't know their names because he didn't do the buying and had nothing to do with the books. After Charles' death, Charles, Jr., and his brother assumed the buying responsibilities. Charles, Jr. admitted knowing the names of some of the suppliers for cash, but when his deposition was taken by the Government he refused to name them on the advice of counsel.

Finding itself thus thwarted in its efforts to obtain the facts concerning the cash purchases, the Government disallowed 50 percent of the cash payments and increased the distributable income of the partnership commensurately. The seemingly arbitrary disallowance was justified, according to the Government, because the relationships between cash purchases, gross receipts and net income, as reported by the taxpayers, disclosed "a very funny pattern" [5]. These relationships are shown in the following tabulations extracted from the Government's brief:

| | | | | Checks Issued to Cash | |
| Year | Gross Receipts As Per Return | Net Income Reported | Total | Claimed As Payroll | Claimed as Purchases |
|---|---|---|---|---|---|
| 1947 | | $14,041.74 | $42,000 | $ 8,978.09 | $27,921.01 |
| 1948 | $ 73,475.10 | (4,279.22) | 52,200 | 10,661.81 | 36,538.19 |
| 1949 | 64,735.23 | 8,873.49 | 51,600 | 17,810.80 | 2,378.20 |
| 1950 | 133,391.25 | (668.47) | 71,200 | 35,384.54 | 35,815.46 |

3. These disbursements included approximately $5,000 a year for so-called "commercial bribes" or "tips" paid to persons in connection with barrel purchases. Since these payments are in the same category as the cash payments for the barrels themselves, they will not be dealt with as separate items.

4. While it is not entirely clear from the record that Charles made these statements to the Revenue Agent (R. 23), the Government has placed this interpretation on the testimony (G.B., p. 14).

5. Singularly enough, the Government offered no *proof* that the disallowance of the cash purchases was the basis of the tax deficiency. The only *evidence* which serves to explain any part of the deficiency is the admission by taxpayers' counsel that the "commercial bribery" payments of $5,000 a year had been disallowed as expenses (R. 25), and the admissions reflected in Paragraph 9 of the complaint and the answer that

"The examining officer's report states that 'the increase of partnership profit for the years 1947, 1948 and 1950, and the decrease of partnership profit for the year 1949; was based mainly on the adjustment of business check expenses and cash purchases.' "

The Government emphasizes that in the two years when the cash purchases were the largest, the partnership reported losses. There is nothing necessarily peculiar about this. The profitability of the sale of merchandise depends in large measure upon the difference between the selling price and the cost of the goods sold; and cost of goods sold can be determined only if the inventory at the beginning and end of the taxable period and the interim purchases are known [6]. Notwithstanding that each of these factors is of importance in determining profit or loss, only one—the cost of goods purchased—is supplied in the Government's tabulation. Nor is there anything incongruous in the year-to-year variations between payroll and cash purchase ratios which the Government points to. No evidence was offered that these ratios are normally constant, and no reason has been suggested why lack of such constancy is a circumstance of suspicion. The Government's last observation that annual variations exist in the relationship between receipts and cash purchases is likewise meaningless without information as to the value of inventories at the beginning and end of each year. The so-called "very funny pattern" disclosed by the partnership figures affords no basis for the disallowance of 50 percent, or indeed any other percent, of the cash purchases which the taxpayers claim that they made.

The refusal of Charles and Charles, Jr., prior to trial to divulge the names of the persons to whom the cash payments. were made gives rise to a possible inference that the payments were fictitious. But this is not the only inference to be drawn from the testimony. Joseph testified that Charles had told the Revenue Agent that the suppliers did not want their names "pushed out" and that a disclosure of their identity would be ruinous to the partnership business. From this it is logical to infer that when Charles and Charles, Jr., withheld the names of the suppliers, they were motivated by *bona fide* business considerations. Since each of the two possible inferences is equally cogent, the failure of the taxpayers to designate the suppliers is not clear and convincing evidence that the payments were fictitious.

It is noteworthy that the Government took no action under § 3615 of the I.R.C. of 1939, 26 U.S.C. § 3615 to compel the taxpayers to reveal to the Revenue Agent the names of the suppliers to whom cash was paid [7]. And when the Government took pre-trial depositions and the witnesses refused to disclose the suppliers' names, the Government purposely refrained from resorting to Rule 37, F.R.Civ.P. 28 U.S.C. to get the information. Apparently the Government was more eager to lay a basis for a test case in which to seek judicial recognition of minimum standards of fraud than it was to ascertain the facts [8].

6. The usual method of calculating the cost of goods sold is to add to the inventory at the beginning of the accounting period the cost of goods purchased during the period and deduct from the total thus obtained the inventory at the end of the period. The difference is the cost of the goods sold.

7. The relevant portions of this section provides:

"§ 3615. Summons from collector to produce books and give testimony

"(a) General authority. It shall be lawful for the collector, subject to the provisions of this section to summon any person to appear before him and produce books at a time and place named in the summons, and to give testimony or answer interrogatories, under oath, respecting any objects or income liable to tax or the returns thereof. * * *
 *    *    *    *    *

"(e) Enforcement. Whenever any person summoned under this section neglects or refuses to obey such summons, or to give testimony, or to answer interrogatories as required, the collector may apply to the judge of the district court or to a United States commissioner for the district within which the person so summoned resides for an attachment against him as for a contempt. * * * *"

8. Record, pp. 5, 11.

934

The interest of the Government in sustaining a finding of fraud upon the basis of inferences rather than by direct proof, was again emphasized at the trial. There the Government asked Charles, Jr., to name four of the suppliers to whom cash had been paid, apparently with the expectation he would refuse. When the objection of the taxpayers to the question had been overruled, and it was apparent the question would be answered, the attorney for the Government said:

"I thank Your Honor for the ruling, but the Government prefers not to pursue it."

When the Court indicated impatience with the refusal of the Government to follow up this critical line of inquiry, the Government had Charles, Jr., identify one of the cash suppliers, and then promptly withdrew its question directed to the disclosure of additional names. This head-in-the-sand attitude toward the most obvious source of direct evidence and the demonstrated preference of the Government to rely solely upon inference, makes it particularly difficult to accept its proof as clear and convincing. Cf. Valetti v. Commissioner, supra, 260 F.2d at page 189.

The Government argues that the taxpayers claimed as business deductions certain personal expenditures such as those made in payment of medical and heating bills. The difficulty with this argument is that a fair reading of the testimony will not support the interpretation which the Government has placed upon it.

That the books and records pertaining to the cash purchases have disappeared is undoubtedly a suspicious circumstance. But this fact in the circumstances of this case is not sufficient to establish fraud in the clear and convincing way the law requires.

The cases of Calafato v. Commissioner, 42 B.T.A. 881; affirmed 3 Cir., 1941, 124 F.2d 187, Masters v. Commissioner, 3 Cir., 1957, 243 F.2d 335, Mauch v. Commissioner, 3 Cir., 1940, 113 F.2d 555, and Estate of Bernstein v. Commissioner, 1956 P–H T.C. Memorandum Decisions, Par. 56–260 (1956) cited by the Government are without pertinence. Each involved the failure of a taxpayer to report as income large cash receipts which had been conclusively proven. This fact alone was held to constitute substantial evidence from which the Tax Court could make a fraud finding, since the Government's proof had shifted to the taxpayer the burden of going forward with proof of exculpation which it had not satisfactorily done. This same principle would appear to apply when the validity of a deduction is in issue. The difficulty with utilizing it in the case at bar is that the Government has not established by the *quantum* of proof required in a fraud case that the cash purchases claimed to have been made by the taxpayers were fictitious. There is therefore no evidence sufficient to shift the burden of going forward to the taxpayers. The Government cannot use the taxpayers' failure to prove that the payments were in fact made when the Government has introduced no evidence sufficient to sustain the burden which it carries to establish the contrary. To hold otherwise would be to relieve the Government of the burden of proving fraud and to require the taxpayers to sustain the burden of disproving it.

The taxpayers are entitled to a refund for fraud penalties which they have paid, with interest.

The foregoing constitutes the findings of fact and conclusions of law required by Rule 52(a).

Grace Johnson **FLANDERS**, Plaintiff,

v.

**UNITED STATES of America,**
**Defendant.**

Civ. No. 34571.

United States District Court
N. D. California, S. D.

April 20, 1959.

Paul S. Jordan, Stanley Walsh, Lamson, Jordan & Walsh, San Francisco, Cal., for plaintiff.

Robert H. Schnacke, U. S. Atty., Lynn J. Gillard, Chief Asst. U. S. Atty., San Francisco, Cal., for defendant.

JAMESON, District Judge.

Plaintiff seeks a refund of personal income taxes for the years 1951, 1952, and 1953, on the ground that income received by plaintiff as royalties from certain inventions and patents, taxed as ordinary income, constituted proceeds from the sale of capital assets and should be treated as long-term capital gains.

Plaintiff is the widow of Paul Flanders, who died on September 21, 1944. During his lifetime Flanders was associated with Carl W. Cherry in the development and promotion of inventions relating to rivets, rivet assemblies, and devices for applying the rivets. The nature of the relationship is in dispute and will be discussed later herein.

On June 21, 1937, Cherry filed an application for a patent on his "rivet". On December 19, 1939, patent (No. 2,183,-543) therefor was issued to Cherry. Subsequently patents were issued to Cherry covering various improvements on the rivet and on the machine or "gun" used to apply the rivet. Flanders was not at any time a record owner of any of these patents on the records of the United States Patent Office.

Flanders and Cherry had known each other for many years. Beginning in 1936 or 1937, Flanders assisted in the promotion of Cherry's invention. Both Cherry and Flanders are now deceased, so that their relationship must be determined from the testimony of others. It is perhaps best described by Jeanne Cherry, Carl's widow, who testified that Cherry told her Flanders was going to help promote the invention with him; that "Carl was the inventor and Paul was the one who was helping him to get his inventions out;" and that she "should think it was a joint operation." Plaintiff testified that Flanders took care of the business end of the deal and marketing end of the rivets while Cherry took care of the technical end of the work.

Cherry Rivet Company, a California corporation, was organized early in 1940. By written agreement dated March 8, 1940, Cherry and Flanders, as licensors, granted to Cherry Rivet Company, as licensee, full and exclusive rights to manufacture and sell, in the United States, rivets made from non-ferrous materials, and guns to apply them; to manufacture and sell, in the United States, guns and rivets made of any material to be used in the aircraft industry; to sell, but not to manufacture, anywhere in the world, guns and rivets of any material; and to authorize purchasers of the rivets to practice any of the patented processes. The agreement

did not specifically authorize the licensees to "use" the rivets.[1]

As of March 8, 1940, (although the agreement was not executed until August 16, 1940) Cherry and Flanders also entered into a written agreement which provides that Cherry "assigns and agrees to pay" Flanders "(25%) of the net receipts of Cherry for all moneys, property or other rights which may be received by Cherry from or on account of said inventions, patents and contracts, including all rights in, to, or under all future inventions which Cherry may invent relating to or adapted for use with rivets, and from all contracts which may be entered into relating to the same, and agrees to pay such * * * (25%) to said Flanders currently when and if received."[2]

---

1. The primary license agreement (Ex. 1–B), dated March 8, 1940, and executed May 14, 1940, was substituted for a prior agreement and amendment, both dated March 8, 1940. Pertinent provisions upon which the respective parties rely include:

"Whereas, said Licensors are the sole owners of United States Letters Patent No. 2,183,543 for new and useful improvements in rivets, * * * (the respective interests of Licensors being shown in a separate agreement between said Licensors), and

"Whereas, said Licensee desires to acquire certain license rights from Licensors * * *.

" * * * said Licensors do hereby give and grant to said Licensee * * *;

"(1) The full and exclusive right and license for, in and throughout the United States of America, to manufacture and sell rivets and rivet assemblies which are made of non-ferrous materials, and rivets and rivet assemblies for use in the aviation industry regardless of the material from which they are made, under said Letters Patent 2,183,543 and under * * extension and re-issues thereof, and to authorize the purchasers of said rivets and rivet assemblies to use and practice the process set forth and claimed in said Letters Patent.

"(2) The full and exclusive right to manufacture, lease, or sell any and all other inventions or developments * * which * * * pertain to or are connected with rivets, rivet assemblies or the method of manufacturing or applying the same, * * *.

"(3) The full and exclusive right and license to manufacture, lease or sell said machines or guns for the application of said rivets * * *

"(4) The full and exclusive right and license to manufacture and use machines for the manufacture of said rivets, rivet assemblies or guns.

"(5) The full and exclusive right to authorize purchasers of said rivets and rivet assemblies to practice any process set forth and claimed in said Letters Patent No. 2,183,543 * * *

"(6) The full and exclusive right to sell (but not to manufacture) anywhere in the world, rivets and rivet assemblies * * * made in accordance with or under the above mentioned patent, * * * and

"(7) To sell or lease (but not to manufacture) anywhere in the world apparatus or guns for applying rivets of the kind or description covered by this License Agreement; * * *"

Counsel for plaintiff call attention to the use of the word "Licensors" throughout the agreement, and particularly to paragraph 18 providing that, "Licensee agrees to pay Licensors, jointly, royalties due hereunder; * * *"

2. Additional provisions of this agreement (Ex. 1–A) include:

"(2) By 'net proceeds' is meant the amount remaining from such receipts after deducting all necessary and proper expenses incurred by Cherry in and about developing and/or patenting and/or promoting such inventions.

"(3) Any disposition by Cherry of any of his rights relating to such inventions shall be subject to the payment to Flanders of twenty-five per cent. (25%) of the net proceeds any time received by the transferee of such rights, provided, however, if any such transfer is made for a valuable consideration twenty-five per cent. (25%) of which is paid to Flanders, then such transfer shall be free of all obligation on the part of transferee to make any payment to Flanders.

"(4) Cherry and Flanders shall share respectively in proportion of seventy-five per cent. (75%) and twenty-five per cent. (25%) the option to purchase stock in Cherry Rivet Company, set forth in a certain agreement between the parties hereto and Roland T. Kinney and Wendell H. Kinney dated the 6th day of February, 1940.

"(5) The denoting of Cherry and Flanders as 'sole owners' in any other agree-

Defendant argues that plaintiff is precluded from urging a joint venture by reason of plaintiff's statement in the pre-trial order that the written agreement between Cherry and Flanders was "for the purpose of reducing their prior oral understanding and agreement to writing." It is true, as defendant contends, that plaintiff is bound by her statement of facts and issues contained in the pre-trial order.[3] I do not find any inconsistency, however, between the contention therein recited and the con-

---

ment shall not in any way enlarge the rights of Flanders beyond the terms of this agreement.