**B. B. CARTER and Mrs. Tommie V. Carter, Appellants,**

v.

**Ellis CAMPBELL, Jr., Director of Internal Revenue, Appellee.**

**No. 17443.**

United States Court of Appeals Fifth Circuit.

March 10, 1959.

**932**

Wentworth T. Durant, Robert J. Hobby, Dallas, Tex., for appellants.

Davis W. Morton, Jr., I. Henry Kutz, Lee A. Jackson, Joseph F. Goetten, Dept. of Justice, Washington, D. C., Andrew F. Oehmann, Acting Asst. Atty. Gen., Charles K. Rice, Asst. Atty. Gen., John C. Ford, Asst. Atty. Gen., William B. West, III, U. S. Atty., Fort Worth, Tex., on the brief, for appellee.

Before HUTCHESON, Chief Judge, and BROWN and WISDOM, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

This appeal turns on the burden of proof in a taxpayer's suit to recover civil fraud income tax penalties. Intertwined are those naturally related to that question—was the burden properly interpreted and applied by the District Court, and, if so, did the evidence justify the finding and judgment adverse to the taxpayer. In the disposition we make of the case at this stage, the situation can be briefly summarized.

Carter, the appellant-Taxpayer, in his brief correctly describes this as a civil sequel [1] to his last visit here. Carter v. United States, 5 Cir., 1955, 224 F.2d 563. So far as appears no action since that time has been taken on the criminal case. But pending at that time was the Taxpayer's claim for refund of income tax deficiencies and civil fraud penalties paid in April 1954 and for which this suit was filed in January 1958.

The suit [2] against the District Director to recover overpayments concerned only the tax year 1946. Taxpayer and his wife by separate but identical returns

---

1. In rejecting his appeal from the District Court's refusal to grant his motion to set aside a prior plea of guilty for criminal income tax evasion for the years 1944, 1946 and 1947, we made these observations. "After some apparent reservations about the matter, they [Carter's counsel] do finally admit, however, in their reply brief filed after argument of the case on appeal, that their real purpose in attempting to set Carter's conviction aside is to improve Carter's chance of obtaining a tax refund for the years in question. * * * Now he asks this court to find that the district court abused its discretion in refusing to let him withdraw his plea of guilty so that he can plead the statute of limitations against further prosecution, or in the alternative, reclaim some of the taxes and penalties he has been required to pay." 224 F.2d at page 564. Our decision was reversed per curiam 1956, 350 U.S. 928, 76 S.Ct. 301, 100 L.Ed. 811.

2. Separate suits were filed by husband and wife, but consolidated for trial and judgment. Only the suit by Carter, the husband, is involved here.

had reported a tax of $2,858.59 each, or a combined tax of $5,717.18. Deficiency assessments fixed the husband's[3] tax at $54,199.76, including fraud penalties, and that of the wife,[4] with no penalties, at $32,601.39. A detailed breakdown was not made, but testimony, not here challenged by the Government, from Taxpayer's accountant indicates that after excluding the 50% civil fraud penalty of $11,924.60 and interest on the deficiency against both husband and wife, the combined tax was in the neighborhood of $53,415.60 or roughly ten times that originally returned and paid.

After timely claims for refunds filed with the Commissioner, the suits were each for the recovery of $23,849.21 in taxes plus interest. The husband's suit also sought recovery of the civil fraud penalties of $11,924.60. The District Court denied all relief and entered judgment for the District Director. The husband alone appeals and only as to the civil fraud penalty. Thus, as to the husband, the case is one of a taxpayer who has judicially acknowledged the existence of a substantial deficiency.[5]

Taxpayer was a stockman-farmer of Stratford, Texas. He had a large ranch on which he raised cattle which he bought and sold. He also had a large farm producing feed for his cattle and wheat which he sold. His operations were extensive. The original return for 1946 showed cattle sales of $410,737.11. Gross income from cattle sales was $99,-555.83. To this was added miscellaneous income plus grain sales in the amount of $23,820.95 for a total gross income of $131,480.26. These operations, particularly the sale of cattle, required considerable financing, and during the year 1946 Taxpayer borrowed over $120,000 from the First State Bank of Stratford. Interest charges, taken as a deduction, exceeded $10,000. Expenses, none of which are shown on this record to have been improperly taken, total $77,739.95 leaving a net income of $22,188.91. With some small capital gains, this produced a community income of $25,607.31 which, on division between husband and wife, fixed the tax at $2,858.59 for each.

Taxpayer had little formal education. Prior to 1940, he had not had to file any income tax returns. With a marked increase in his income, the president of the local bank, upon inquiry, recommended that his returns be prepared by Russell, a local lawyer and accountant. As a farmer, Taxpayer was not required to keep books. Treas.Reg. 111, § 39.54–1. He did not. Returns were prepared primarily on the basis of Taxpayer's records of bank deposit slips, bank statements and cancelled checks, and, as Russell put it, "such other information as he could give us."

The Government did not undertake to show the composition of the deficiency which we now treat as judicially confessed, see note 3, supra. To show that a *part* of that deficiency was attributable

3. Paid by husband on income reported by calendar 1946 returns .................. $ 2,858.59
Assessed and paid as additional tax, plus interest and 50% penalties ....... 51,341.17
                                                                              —————————
                                                                              54,199.76
Less: 50% civil fraud penalties, here in issue              11,924.60
                                                           —————————
Total calendar 1946 tax and interest paid, now uncontested ........ $42,275.16

4. Paid by wife on income reported by calendar 1946 return ................. $ 2,858.59
Assessed and paid as additional tax, plus interest .. 29,742.80
                                                      —————————
Total calendar 1946 tax and interest paid, now uncontested ........ $32,601.39

5. Exclusive of penalty, but including an undisclosed amount of interest, this was $42,275.16, see note 3, supra.

to fraud,[6] the Government relied on two specific grain sale items which were not run through the bank account. One[7] was used in the purchase of property, the other[8] as a payment on Taxpayer's indebtedness to the First State Bank of Stratford. They aggregated $20,752.69, and it must now be conceded that this was additional and unreported income. Taxpayer never denied the fact of the receipt or use of these checks. He denied vigorously, however, that he had intentionally concealed them from Russell or his staff. On the trial he swore that he told Russell's office of them. However, on cross examination he was confronted with prior inconsistent statements made to the Special Agent in 1948 implying that he had not done so or must have forgotten to do so.

In addition to these prior inconsistent investigative statements, the Government sought to prove by Russell that Taxpayer had not in fact informed his office about these checks. Russell's testimony was inconclusive as he could not recall any particular discussion with Taxpayer which he personally had. He was strong in the implied opinion that Taxpayer had not told any of his staff because had he done so, a memoranda would have been made and no such memorandum was in the file. Those who might have had something to do with preparation of Taxpayer's return or discussion with him were Boomer, Underwood and Mrs. Hancock. Neither Boomer nor Underwood were called as witnesses. Mrs. Hancock was certain that Taxpayer had not mentioned these checks to her or any one else as there was no file memorandum to indicate it. But she had to acknowledge, of course, that she did not know what, if anything, Taxpayer might have told Boomer or Underwood. At least on the face of things, this approach—which sought to prove that Taxpayer did not give Russell's staff information because no memorandum was found in the file of work papers—was certainly weakened by one incident. The work paper file showed a deposit slip[9] dated December 14, 1946, for over $7,000 from cattle sales. However, only $442.93 of this had been included by Russell's staff in determining gross income and in computing tax. No explanation was made or offered as to how Russell's office, whose records were championed as well-nigh infallible, happened to make this error. That it was an error is conceded, for while this added another $6,735.57 in unreported income which went into the total on which the deficiency was computed, it was never, nor is it now, claimed that this omission[10] was fraudulent.

So far as this record now reflects, apart from the two specific checks, notes 7 and 8, supra, there was no evidence from which to infer that the wide disparity between the combined taxes paid

6. "If any part of any deficiency is due to fraud with an intent to evade tax, then 50 per centum of the total amount of the deficiency (in addition to such deficiency) shall be so assessed, collected, and paid, in lieu of the 50 percentum addition to the tax provided in section 3612(d) (2)." Int.Rev.Code of 1939 § 293, 26 U.S.C.A.

7. On August 13, 1946, Taxpayer received from Santa Fe Grain Company, a local concern, its check for $6400. On August 14, Taxpayer used this check to purchase from First State Bank a cashier's check in like amount payable to persons from whom he was buying real estate.

8. On November 2, 1946, Taxpayer received from Santa Fe Grain Company its check in the amount of $14,352.69. On November 4 Taxpayer endorsed this check over to First State Bank as a credit on his open demand note.

9. The deposit slip showed a check of Keener in the amount of $7,178.50. On the face of the deposit slip was the further notation:
"balance of note $6,735.57
"int. 442.93
$7,178.50."

10. Another omission casting doubt on the sufficiency of operations of the accountant's staff, but on the opposite side of the ledger, was the failure to take a $25,000 deduction for cattle purchases. Deductibility was acknowledged by the Special Agent and presumably taken into account in computing the deficiency.

($5,717.18) and that finally assessed ($53,415.60 exclusive of penalties) was due to concealment or any improper or fraudulent action. On the contrary, on the record so far developed, a routine income tax adjustment [11] which required Taxpayer to show an opening grain inventory in 1946 (although he had not done so for 1945, 1946, or 1947, and no fraud was imputed because of this controversy over proper tax and accounting practice) precipitated the remainder [12] of the deficiency.

In other words, in the present posture of the case, the two grain check items aggregating $20,752.69, see notes 7 and 8 supra, stand on their own and do not take on character as fraudulent or non-fraudulent by reason of the remainder of the deficiency.

This means that the case on the present record narrowed down to the ultimate question: did Taxpayer purposefully conceal these grain items so that they would not be reported as income upon which a tax would be payable, or was the omission by Russell due to mere neglect or error, either because Taxpayer failed to inform his attorney-accountant of the facts or because of error in the receipt, consideration and use of the Taxpayer's information by Russell's office?

■■ Were the case pending in the Tax Court, and before us on a petition of review, we would determine it against very exacting standards. There is first the matter of what is and what is not fraud. We have recently given our approval, Olinger v. Commissioner, 5 Cir., 1956, 234 F.2d 823, 824, to the strong language of Davis v. Commissioner, 10 Cir., 1950, 184 F.2d 86, 87, 22 A.L.R.2d 967. "Fraud implies bad faith, intentional wrongdoing and a sinister motive. It is never imputed or presumed and the courts should not sustain findings of fraud upon circumstances which at most create only suspicion." Equally emphatic is that stated for us by Judge Sibley in Mitchell v. Commissioner, 5 Cir., 1941, 118 F.2d 308, 310. "Negligence, wheth-

---

11. Taxpayer's certified public accountant's testimony is not challenged by the Government. He testified that the Agent's report showed a tax due of $53,415.60 excluding interest and penalties. On the basis of that same report and return, if an opening 1946 inventory for grain was not used, the total tax was $21,025.64 or a difference of $32,389.96.

---

12. 

| Total tax due (excluding interest and penalty) | | $53,415.60 |
|---|---|---|
| Less: Paid with Returns | $ 5,717.18 | |
| Tax added by adjustment for opening grain inventory | 32,389.96 | 38,107.14 |
| Remainder of Tax | | $15,308.46 |

The only items of additional income upon which the remainder of the tax ($15,308.46) would be based are:

| *Allegedly Fraudulent* | | |
|---|---|---|
| Check, see note 7, supra | $ 6,400.00 | |
| Check, see note 8, supra | 14,352.69 | $20,752.69 |
| *Non-Fraudulent* | | |
| Deposit slip, see note 9, supra | | 6,735.57 |
| | | $27,488.26 |

The Special Agent, over Taxpayer's strong objection, was allowed to testify that he "recommended the imposition of fraud penalties" because his "examination disclosed grain *and cattle sales* of approximately $23,000 which were not reported on the 1946 income tax return." No factual evidence whatsoever was offered to support the Agent's conclusion concerning allegedly fraudulent cattle sales in the approximate amount of $2300 ($23,000 less grain sales $20,752.69).

er slight or great, is not equivalent to the fraud with intent to evade tax named in the statute. The fraud meant is actual, intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing. Mere negligence does not establish either." These principles have been restated frequently and recently with no recession either from emphatic language or like application. Goldberg v. Commissioner, 5 Cir., 1956, 239 F.2d 316, 321; Fairchild v. United States, 5 Cir., 1957, 240 F.2d 944, 947; Eagle v. Commissioner, 5 Cir., 1957, 242 F.2d 635, 638; Jones v. Commissioner, 5 Cir., 1958, 259 F.2d 300. See also 10 Mertens, Federal Income Taxation § 55.10.

■ Added to this is the burden placed upon the Commissioner. The Code [13] places it expressly upon the Commissioner. 10 Mertens, Federal Income Taxation § 55.18. "The burden is upon the Commissioner to prove affirmatively by clear and convincing evidence actual and intentional wrongdoing on the part of the petitioner with a specific intent to evade the tax." Eagle v. Commissioner, 5 Cir., 1957, 242 F.2d 635, 637. 10 Mertens, supra, at § 55.16.[14]

■■ Where the case involves both a deficiency and a civil fraud penalty, each party has its own peculiar burden of proof.[15] The result is, as we once pointed out, Snell Isle, Inc. v. Commissioner, 5 Cir., 1937, 90 F.2d 481, certiorari denied 302 U.S. 734, 58 S.Ct. 120, 82 L.Ed. 568, the case may end in a standoff from the failure of each party to go ahead with his evidence.[16] The taxpayer fails on the deficiency. The Government fails on the fraud penalty. Failure of the taxpayer to overcome the deficiency does not create a presumption of fraud. See also Olinger v. Commissioner, 5 Cir., 1956, 234 F.2d 823.

This brings us then to the question of whether the fact that this is a taxpayer's

13. The 1939 Code, applicable here, provides in Section 1112: "In any proceeding involving the issue whether the petitioner has been guilty of fraud with intent to evade tax, the burden of proof in respect of such issue shall be upon the Commissioner." This is carried into the 1954 Code as Section 7454, 26 U.S. C.A.

14. This is so pervasive that this noted authority has observed "It is urged that, as a practical matter, there cannot be a proper concept of civil fraud in tax thinking without consciously and prominently keeping the Government's burden of proof in mind at all times." 10 Mertens, supra, at § 55.10, note call 11.4.

15. "While the burden of proving fraud is always on the Government, the fact that the Government is trying to prove fraud does not change the rule that the deficiency itself is presumed to be correct until the taxpayer satisfies his burden of proving the inaccuracy of the asserted deficiency." 10 Mertens, supra, at § 55.-18, p. 73.

16. In Drieborg v. Commissioner, 6 Cir., 1955, 225 F.2d 216, 218, Judge, now Justice, Stewart for the 6th Circuit elaborates on this. "That the difference in the burden of proving ordinary tax deficiencies and civil fraud can have important practical results has long been recognized. 'As to the issue raised by [the Commissioner's] determination of fraud the burden is upon him; and he may fail to sustain such burden, notwithstanding the determined and presumed error in the return. In other words, both parties may fail through inadequate proof on their several issues, and thus the deficiency would be sustained and the penalties set aside.' L. Schepp Co., 1932, 25 B.T.A. 419, 437. 'The failure of the taxpayer to overcome the presumptive correctness of the deficiency, as is true in the case at bar, does not create a presumption of fraud. Both parties in a proceeding of this nature may fail through inadequate proof on the several issues.' Sol Gross, Para. 49, 254 P-H T.C. Memo., Docket No. 15004, 10–11–49. See * * * Snell Isle, Inc. v. Commissioner, 5 Cir., 1937, 90 F.2d 481, 482; Bryan v. Commissioner, 5 Cir., 1954, 209 F.2d 822, 825.

"The Commissioner in the present case points out, however, that the taxpayers have virtually conceded both in the Tax Court and upon this review that their evidence was insufficient to overcome the presumed correctness of the Commissioner's determinations. We fail to perceive how this rather forthright concession by counsel for the taxpayers relieves the Commissioner of any part of his statutory burden of proof of their fraud."

District Court suit for refund alters either this rule or its inexorable application. Two things tend to suggest that a different rule might be applied.

■ Foremost, of course, is the accepted principle that a taxpayer's suit is essentially the common law action for money had and received which thereby imports into it equitable considerations. A taxpayer recovers a tax previously paid only if the exaction was illegal and the Court concludes that it would be inequitable to permit the Government to continue to retain the payment.[17] Hartwell Mills v. Rose, 5 Cir., 1932, 61 F.2d 441, 443. Perry v. Allen, 5 Cir., 1956, 239 F.2d 107, 112.

The second suggestive factor is more technical. It is that the statutory imposition of the burden of proof on the Commissioner, Section 1112, see note 13, supra, happens to be found in Chapter 5 of the Internal Revenue Code which is entitled "The Tax Court of the United States." This is highlighted by the fact that it speaks in terms of "the petition-er" which is, of course, the pleading title of a taxpayer seeking relief.

■ Offsetting these factors are counter-considerations. The first of these is that in a broad sense Congress has undertaken to provide two basic mechanisms by which a taxpayer may challenge the legality of a tax or an assessment. He may decline to pay and, provided prescribed steps are taken, he may have a determination of this before collection and payment. This is the Tax Court route resulting in a decision by an administrative court with a review by a Court of Appeals on that record. On the other hand, he may, if he wishes and has the means, pay the disputed tax and after exhausting refund claim procedures, sue either the District Director or the United States to recover back the payments. Mertens, supra, at § 58A.18. But except perhaps in rather limited situations, both have a common objective of assuring that the heavy, but unavoidable, hand of the tax gatherer falls only in accordance with laws.[18]

17. "The action, brought to recover a tax erroneously paid, although an action at law, is equitable in its function. It is the lineal successor of the common count in indebitatus assumpsit for money had and received. * * *.

"Its use to recover upon rights equitable in nature to avoid unjust enrichment by the defendant at the expense of the plaintiff, and its control in every case by equitable principles * * * have long been recognized in this Court. * * * It is an appropriate remedy for the recovery of taxes erroneously collected * *. The statutes authorizing tax refunds and suits for their recovery are predicated upon the same equitable principles that underlie an action in assumpsit for money had and received. * * * Since, in this type of action, the plaintiff must recover by virtue of a right measured by equitable standards, it follows that it is open to the defendant to show any state of facts which, according to those standards, would deny the right, * * *." Stone v. White, 1937, 301 U.S. 532, 534–535, 57 S.Ct. 851, 852, 81 L.Ed. 1265, 1269–1270.

18. See S.Rep. No. 115, H.R.Rep. No. 659, Conf.Rep. No. 2276, 83d Cong., 2d Sess., 1954, U.S.Code Cong. & Adm.News, pp.

2716–2721. S. 252 was enacted into 28 U.S.C.A. § 1346(a) permitting suits in the District Court against the United States without regard to the previous $10,000 limitation. Discussed also in these reports was that portion subsequently enacted into 28 U.S.C.A. § 2402 over the opposition of the Department of Justice and the Secretary of Treasury allowing jury trials in such suits the same as in the liberalized practice relating to suits against District Directors.

After first listing the four remedies open to a taxpayer (Tax Court, suit for refund against Collector, or United States in District Court or Court of Claims), it goes on to state: "The remedy in the district court was created for the purpose of giving the smaller taxpayers who could not afford to pursue an action in Washington a practical remedy. The committee thinks that the greatly increased tax burden and the great increase in litigation of this type which it has produced has made the fixing of any such monetary dividing line between remedies available to different taxpayers no longer practical or desirable. It is our opinion that all taxpayers, regardless of their financial status, should be permitted to pursue his remedy in the jurisdiction where he resides, or where the tax

■ A second counter-factor is that in a taxpayer's suit for refund it is the Commissioner, not the District Director or the United States itself, whose determination is subject to review. As we discussed earlier, a taxpayer fails in the effort to recover a deficiency unless he satisfactorily demonstrates that the Commissioner's determination was erroneous. This result occurs whether the review is in the Tax Court or District Court. Helvering v. Taylor, 1935, 293 U.S. 507, 514, 55 S.Ct. 287, 79 L.Ed. 623; Niles Bement Pond Co. v. United States, 1930, 281 U.S. 357, 50 S.Ct. 251, 74 L.Ed. 901; Reinecke v. Spalding, 1930, 280 U.S. 227, 50 S.Ct. 96, 74 L.Ed. 385; Estate of Phillips v. Commissioner, 5 Cir., 1957, 246 F.2d 209. That means that Section 1112, note 13, supra, deals with a subject —i.e., the correctness of the Commissioner's determination—which is present both in a Tax Court proceeding and a District Court suit for refund.

We have not previously had occasion, in weighing these and other factors, to determine expressly whether a different rule should control depending on the Tax Court or District Court route. We have raised it here because of its general importance as well as its immediate significance in this case. Actually the Government does not question that the same burden is on it in either forum. At the bar its advocate conceded that this was the rule. Neither by brief nor argument, here or below, has the Government questioned it.

While we have not discussed it in these terms, we have, however, applied the principle that the burden of proof is on the Commissioner in a tax refund suit. In Fairchild v. United States, 5 Cir., 1957, 240 F.2d 944, taxpayer paid a deficiency and fraud penalties and then sued to recover these payments. Fraud was at the very heart of the case and the appeal.[19] But even though this was an equitable action for money had and received, we reversed and rendered the case, not because the taxpayer had demonstrated his equitable right to the money or that the equities suggested that it was unjust for the Government to retain the money rightfully his. Had such considerations been controlling, the many circumstances reflected in the net worth effort to reconstruct the income of taxpayer during his long career as a professional gambler with inadequate or no books or records, would certainly have permitted a different approach. Our reversal was squarely and directly on the basis that the Government had failed in its burden. "We agree with appellant that the judgment may not stand. A careful examination of the entire evidence in this case has left us with the definite and firm conviction that the findings on the issue of fraud were wrong and must be set aside for the reason that the Government has failed to prove by clear and convincing evidence taxpayer's actual and intentional wrongdoing with a specific intent to evade the tax. Goldberg v. Commissioner of Internal Revenue, 5 Cir., 239 F.2d 316; Mitchell v. Commissioner of Internal Revenue, 5 Cir., 1941, 118 F.2d 308." 240 F.2d at page 947.

■ We think that approach is the correct one. There is no direct precedent

accrued, and not be required to go to the expense and practical difficulty of taking himself, his records, and his witnesses to Washington, procuring Washington counsel, * * *." 1954 U.S. Code Cong. & Adm.News, at page 2717.

Mertens describes it as an option in the taxpayer. "Under the 1926 Act and subsequent revenue acts, including the 1939 Code and the 1954 Code, the taxpayer is given an option, where a notice of deficiency proposing an additional tax is received, either (1) to petition The Tax Court, or (2) to pay the tax, applying for a refund or credit and, if that is not allowed, to sue in the federal courts for the recovery of the overpayment. * *." Section 58A.03, p. 7.

19. "Inasmuch as the deficiency was not timely assessed and, but for proof of fraud such deficiency would have been barred, the first and crucial question * * * is whether the court correctly held that taxpayer was guilty of fraud and evasion in connection with his 1945 income tax return." 240 F.2d at page 945. Int.Rev.Code of 1939, § 276, 26 U.S.C.A.

to the contrary. Moreover, it is in accord with the rule of the Eighth and Ninth Circuits. The precise question was the principal subject dealt with by the Ninth Circuit in Ohlinger v. United States, 9 Cir., 1955, 219 F.2d 310. We concur substantially in what was stated and find it unnecessary to summarize the Court's reasoning. The same result was reached by the Eighth Circuit. "In order to sustain the imposition of the 50% penalty, it was incumbent upon the [Government] to show by clear and convincing evidence that the deficiencies in tax were due to fraud with intent to evade tax." Hargis v. Godwin, 8 Cir., 1955, 221 F.2d 486, 489. It cited its previous opinion Owens v. United States, 8 Cir., 1952, 197 F.2d 450, affirming D.C.Ark., 98 F.Supp. 621. To these Mertens Section 52A.35, n. 17, adds a great list of district court cases.[20]

■ Because our review of the facts is limited to the clearly erroneous concept of F.R.Civ.P. 52(a), 28 U.S.C.A. and questions of fact are so vital to the determination of the issue of fraudulent intent which is ordinarily incapable of direct proof, see 10 Mertens, Federal Income Taxation, § 55.10, we must be certain that in arriving at its judgment

the District Court weighed the evidence against this standard. We have no such assurance here. The Court's brief oral memorandum opinion [21] supplemented only by a formal judgment leaves much undisclosed.

The findings, almost at the outset, emphasize in par. [3], note 21, supra, that the plaintiff has "not met the burden of proof that is required." The opinion ends in this same tenor. For after making a brief, but passing, reference to concealment, the Court states its conclusion of law in the classic terms of unjust enrichment. This it does in par. [6] in stating "that it would be unjust and unfair, and is unjust and unfair, to ask the government to return *any* amount to either one of these Plaintiffs." Sandwiched in between these two statements is the Court's only reference to the fraud aspect. It stated, par. [5], "the Plaintiff Husband * * * manifestly concealed a large portion of his income taxes by reason of concealment of profits that he had made upon things that were produced by him, such as farm produce, cattle, and so forth."

■ One may read many things in this. The Court might have meant that the failure of Taxpayer to report the

---

**20.** See also Veino v. Fahs, 5 Cir., 1958, 257 F.2d 364; Mickler v. Fahs, 5 Cir., 1957, 243 F.2d 515. Equitable considerations played no part in these.

**21.** After preliminary recitals on dates of filing, the Court stated orally (paragraph numbers in brackets [ ] are inserted for ease of reference):

[1] The Plaintiff Husband seeks a refund of $45,615.60, plus interest and so forth, and the Plaintiff Wife seeks a refund of $30,160.53, plus interest and so forth.

[2] The evidence discloses that the Plaintiff Husband was up before another Judge of this Court, who tries the criminal docket, for having evaded his income tax for this particular year. But the Plaintiff Wife, of course, has no such testimony against her.

[3] But I find, gentlemen, that the Plaintiff Husband and the Plaintiff Wife have not met the burden of proof that is required in order to have a judgment for a refund of these particular income

taxes to which I have previously called attention.

[4] The testimony here discloses that the income tax returns that were filed by the Plaintiff Husband for both he and the Plaintiff Wife were not correct and that there is no proper basis to allow a recovery against the government for what is contended to be an overpayment of income taxes for these particular years.

[5] The testimony that has been developed here disclosed, on the contrary, that the Plaintiff Husband, who is responsible, of course, for having made out this return for both himself and the wife, manifestly concealed a large portion of his income taxes by reason of concealment of profits that he had made upon things that were produced by him, such as farm produce, cattle, and so forth.

[6] And I find, gentlemen, as a conclusion of law, that it would be unjust and unfair, and is unjust and unfair, to ask the government to return any amount to either one of these Plaintiffs.

two grain items to Russell's office concealed this essential fact from the accountant and hence concealed it from the Government. Resulting concealment of that kind could come from a wilful purpose and an evil intent, or it could have come from carelessness, or negligence, or inadvertence on Taxpayer's part. Quite without regard to any supposed technical deficiencies of such a finding under the rules, F.R.Civ.P. 52(a), and which we regard as so essential to the performance of our serious, though limited, function, Victory Towing Co. v. Bordelon, 5 Cir., 1955, 219 F.2d 540, this finding is an equivocal one when measured against the foreboding test of fraud. "The fraud meant is actual, intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing." Mitchell v. Commissioner, 5 Cir., 1941, 118 F.2d 308, 310. We may say of this as we did the equivocal finding of the Tax Court in that case, "We think there ought to be a fact-finding that [Taxpayer] in making this return knew or did not know its probable falsity, and that he intended to evade a tax or did not." id.

On the record before the District Court, there was nothing save the unsupported conclusion of the Special Agent about unreported cattle sales. From that, without more, the Court could not possibly have drawn a conclusion whether the omission of such sales was purposeful or evil or accidental. Likewise as we have explained earlier, apart from the two grain checks, the remainder of the deficiency was in no way shown to have been due to reasons other than routine tax accounting adjustments. That left only the two grain check items. To say these were "concealed" is, on this record and at this stage, ambiguous to say the least. The *transactions* were certainly not concealed. There was nothing furtive about either of them. To be sure the Government thinks that these items should have been run through Taxpayer's bank account. But farmers and ranchers are treated as a special class by Congress, and no books or records of any kind are required. Indeed what this rancher did was exactly what Eagle did. There we held that fraud had not been established merely because he used checks received from third persons as payment of his notes to the bank. Eagle v. Commissioner, 5 Cir., 1957, 242 F.2d 635, 638. Laymen untutored in the niceties of income tax law, accounting or banking might think it quite unnecessary to endorse and deposit one check in the bank and draw and deliver a new check drawn on that very bank in like amount and payable to that very bank. Likewise, if there were no concealment at the time of the receipt of the checks, the question arises when and how did the concealment take place as it bore on income tax. Presumably this was in Taxpayer's contacts with Russell's staff. With two other persons identified as ones in that office having responsibility for preparation of returns, neither one of whom were called to testify, the record is at least equivocal on what Russell's staff really knew, especially since a serious error admittedly was found in the omitted deposit slip, note 9, supra.

This may read as though we are finding that the evidence was insufficient. We disavow any such purpose. We never get that far. These possible implications in the evidence, pro and con, are stated to indicate that it is essential that we be able to conclude with a certainty just how the District Court treated these facts. If, as the oral opinion seems strongly to suggest, see par. [4] and [6], note 21, supra, the Court considered that these circumstances made it unjust and inequitable for Taxpayer to recover them, that is one thing. But that is not the finding of fraud or the equivalent of a finding of fraud. On the other hand, if it was meant as a finding of fraud, there is no way to tell whether this conclusion resulted from an affirmative finding pursuant to the burden of proof which we hold was on the Government, or whether it followed automatically from a failure on the part of the Taxpayer to carry the burden—erroneously assumed to be on Taxpayer—to prove

that it was equitable for him to recover, inequitable for the Government to retain, the penalty sums. Not only do the Court's words fail to afford this required assurance, but the record indicates that the Court seemed to labor under some confusion on this phase.[22]

▆▆▆▆ Both Government and **Taxpayer** are entitled to a trial of the hotly contested inferences by a court consciously applying the correct legal standards. They will not have had such a trial merely by our undertaking to say that had the standard been applied, the evidence would have warranted the result. Williams v. United States, 5 Cir., 1958, 252 F.2d 887; United States v. Williamson, 5 Cir., 1958, 255 F.2d 512, 515. Trials are committed to trial courts. Our function is limited and circumscribed. The line between the fraudulent and the careless, between the evil and the negligent is shadowy and elusive. The case must cross "that narrow border line which persuades the judicial mind that clear and convincing evidence has established fraud with specific intent to evade the tax." Eagle v. Commissioner, supra, 242 F.2d at page 638. The determination of that crucial issue of motive and purpose calls for the exercise of the infinite actions compressed within the profound concept of the judicial process.

The consequence is that the cause must be reversed and remanded for a new trial in the light of proper legal standards. To avoid any possible misapprehension, we repeat the caveat that nothing said or unsaid about the facts, the details or evidence thereof, or the permissible inferences to be drawn therefrom are to be treated as a holding, an indication, an intimation, or suggestion of any kind that we consider, or will hold, that the evidence is sufficient or insufficient. The District Court has the duty and the obligation to try it completely anew. Only after such a trial and adjudication will we be authorized to determine its sufficiency.

Reversed and remanded.

HUTCHESON, Chief Judge (dissenting).

I am in full agreement with the contention of appellants in their suit for refund of the civil tax fraud penalty asserted and paid for the year 1946, that the burden of proof is on the defendant to maintain the correctness of the exaction.[1]

I disagree, however, with their contention that defendant did not sustain the burden, and with the view of the majority that the district judge was under a misapprehension as to where the burden of proof lay, and, therefore, decided the case on the incorrect theory that to prove the wrongfulness of the exaction, that is to show the lack of fraud, was upon the plaintiffs. I disagree, too, with the view of the majority that the findings were not sufficiently definite to support the judgment and that the judgment should be reversed. In short, it seems to me upon the record that the findings were adequate and the record supports the findings, and that the judgment should be affirmed.

---

**22.** At the conclusion of the Taxpayer's brief case, the Court, in its comments about the Government's motion to dismiss, seemed to consider that it was just one case with the burden remaining constant throughout.

"The Court: Defendant closes?

"Mr. Stetson: [Government counsel]: No, your Honor.

"We would like to move the Court to enter judgment for the Defendant [Government] on the ground that the Plaintiff has failed to make out any prima facie case on any tax refund that is due.

We realize the government has the burden of proof of fraud and we wish to proceed as to that part of the case.

"The Court: You don't divide a motion. If you want to make a motion, you have a right, and if you don't want to make it, you don't have to make it."

**1.** Decker v. Korth, 10 Cir., 219 F.2d 732; Jemison v. Commissioner, 5 Cir., 45 F. 2d 4; Ohlinger v. United States, 9 Cir., 219 F.2d 310; Olinger v. Commissioner, 5 Cir., 234 F.2d 823; F. Vitelli & Son v. United States, 250 U. S. 355, 39 S.Ct. 544, 63 L.Ed. 1028.