**B. B. CARTER**

v.

**Ellis CAMPBELL, Jr., Director of Internal Revenue.**

**Civ. 7636.**

United States District Court
N. D. Texas,
Dallas Division.

Oct. 26, 1959.

**360**

Wentworth T. Durant, Robert J. Hobby, Durant & Hobby, Dallas, Tex., for plaintiff.

Arthur C. Flinders, Tax Division, Department of Justice, Washington, D. C., for defendant.

DAVIDSON, District Judge.

This is a suit for the refund of an income tax fraud penalty which was assessed and collected from the taxpayer for the year of 1946 pursuant to the provisions of Sec. 293 of the Internal Revenue Code of 1939, 26 U.S.C.A. § 293.

On March 10, 1947, the plaintiff-taxpayer, B. B. Carter, filed his 1946 income tax return and paid the tax shown to be due of $2,858.29. A subsequent audit of this return by the Internal Revenue Service revealed that the taxpayer had understated his net income for 1946 in the amount of $82,127.81, and that the understatement was at least partially the result of fraudulent concealment of income. On the basis of the above determination the Commissioner of Internal Revenue levied a deficiency assessment against the taxpayer in the amount of $23,849.21, and assessed a civil fraud penalty in the amount of $11,924.60.

Although the taxpayer agreed to the tax deficiency and penalty for 1946 and paid such amounts plus interest in April of 1955, a claim for refund was filed in August of 1955. The claim for refund was denied and the taxpayer filed this action seeking a return of both the deficiency and the civil fraud penalty.

At the first trial of this case before Judge William Hawley Atwell, the Court found that the taxpayer was not entitled to a refund of either the deficiency or civil fraud assessment. The taxpayer did not appeal from the determination of the trial Court that he was not entitled to a refund of the deficiency, and the existence of such deficiency is therefore judicially acknowledged. The taxpayer did appeal from that part of the decision which upheld the fraud penalty.

The Court of Appeals for the Fifth Circuit reversed and remanded the case insofar as a refund of the fraud penalty was denied saying that it was not clear that the trial Court had applied the correct legal standard. Carter v. Campbell, 1959, 264 F.2d 930. That opinion stressed the importance of an awareness that the Government had the burden of showing a fraudulent omission of income with intent to evade a tax by clear and convincing evidence; that Court further underlined the necessity of sufficiently definite findings to support the judgment rendered.

In this trial the Government's case of fraud centers around two admittedly unreported items of income which took the form of checks from the Santa Fe Grain Company to the taxpayer totalling $20,752.69. In June of 1946 the taxpayer agreed to purchase a tract of land for $6,400. To obtain the money to purchase the tract the taxpayer sold to the Santa Fe Grain Company all of his wheat which was left in the company's elevator at that time. At the taxpayer's request the grain company paid $7,612.00 therefor in the form of two consecutively numbered checks, both of which were issued on the same day. One check was in the amount of $1,212 and was deposited in the taxpayer's bank

account in the customary manner; the second check was in the amount of $6,400, the exact amount of the purchase price of the land, but was not deposited. This latter check was used to purchase a cashier's check from the bank which was in turn used to pay the purchase price of the land.

The second item omitted from income was a $14,352.69 check which was from the Santa Fe Grain Company for the sale of wheat. This check was never deposited in the taxpayer's bank account, as was customary, but was instead credited directly against an outstanding loan from the bank. These two unreported grain sales almost equalled in amount the income from reported sales during that year of $23,820.95.

Beginning with the year of 1940, and continuing down to 1948, the taxpayer continuously relied on an attorney-accountant, Walter G. Russell, to prepare and file his income tax returns. The testimony of Mr. Russell and Mrs. Hancock, a member of his staff, revealed that the taxpayer clearly understood the sources of information to be used in the preparation of his returns: deposit slips, cancelled checks, bank statements, and such other information as the taxpayer might himself furnish his accountant. The taxpayer also understood that Russell and his staff would not undertake to make independent investigations to ferret out transactions not revealed from the above sources. This above procedure was satisfactorily used in the preparation of the tax returns of the majority of other farmer-rancher clients of Mr. Russell's, and had been used in the case of Carter for five consecutive years. In spite of the taxpayer's familiarity with and understanding of these procedures the business records of Mr. Russell revealed that no information had been given to his office concerning the two transactions in question.

Throughout the trial it has been insisted by the taxpayer that he is a farmer of limited education and that he relied on his accountant and did not know he was omitting income from his tax return. The trial Court in these income tax matters feels that the farmer's contention in any such suit should be carefully scrutinized not only on the grounds of the evidence before it, but with an understanding that the uncertainty of the seasons and fluctuation of the markets make it hard on the farmer to establish any substantial abiding profit. In this case, however, the farmer involved is not merely a simple tiller of the soil, but was doing a substantial business which ran into the hundreds of thousands of dollars. He possessed a business acumen that enabled him to know his profits and to lay plans to create and accumulate them.

The mere fact that a man has not been to college does not mean that he has not learned extensively or that he has not obtained an education in experience, where Patrick Henry tells us his feet were guided. This man so far as school goes had as much no doubt as Sam Houston, Andrew Jackson, Abraham Lincoln, Henry Ford or a multitude of others whose names suggest themselves to the Court's mind. So far as education goes it might be said to be a matter of common knowledge that the man who has acquired his learning in the school of experience not infrequently outstrips in a financial way in business the man who acquired his learning in a business college. The latter is often the employee of the former.

The record discloses how again and again the taxpayer exercised his discretion. Take the $6,400 transaction. The usual way not only in the banking and commercial practice, but even with the taxpayer, would be to draw a check or have the bank draw it for him on his own bank account. But thinking to a purpose something out ahead he asked the purchaser of the wheat to make the sale in two checks, one for $6,400 and another for $1,212. He knew he wanted the lesser check to go to his bank account. He had the other check drawn in the exact amount of the purchase price of a tract of land which he was

buying. He took this wheat check and bought commercial paper, thereby placing another link in a possible chain of concealment and making it more difficult for his accountant to include the income in his return even had he been instructed to look up such transactions. A similar attitude of concealment follows the $14,-352.69 transaction. The taxpayer owed the bank. In the same bank he carried his checking account. The $14,352.69 check in the ordinary course would have been placed to his credit as a deposit and would have been found by his accountant in making up his tax; thereby he would have had a record which he might have used not only in tax matters but which would also have served as a business record. He obliterated the record by having the check applied directly against the bank loan without running it through his bank account.

■ We cannot read the mind and intent of a person but we may determine his intention from his acts and doings. Was the conduct of the taxpayer such as to show by the preponderance of all the facts and circumstances that he was seeking to conceal from the Government certain elements of his income in order to evade the tax thereon? We think the record is sufficient to show such an intent and that he was knowingly and willfully concealing his income.

Looking further, however, into the attitude and conduct of the taxpayer, other circumstances not so directly connected as these we have mentioned show his attitude. Credible testimony was offered that the taxpayer stated that a man was "a damn fool for paying it (income taxes) at all." Moreover, there might also be considered that on another occasion, connected however with the same taxpayer's activity, the Government's records, including the income tax file and everything else, accidentally fell into the taxpayer's hands by miscarriage of the mails. No one knew he had it. He surely must have known that it was not

intended for him. He kept these records for a year before turning them over to the Government to which they belonged. Furthermore, the testimony of Mr. Russell that this taxpayer had more omissions from income over a five-year period than any other client for whom he prepared returns suggests something more than carelessness.

The taxpayer cites Eagle v. Commissioner, 5 Cir., 1957, 242 F.2d 635, as being a case substantially similar on its facts and therefore compelling a like conclusion here. We think the dissimilarities between the facts in that case and our circumstances here outweigh the similarities. In the Eagle case the taxpayer was himself responsible for instigating the checking of his tax return, the taxpayer cooperated fully with the Revenue Agent during his investigation, and there was no evidence that the data concerning the unreported income was not furnished the attorney who prepared the return. By contrast the taxpayer here showed little inclination to cooperate and intentionally-retained and concealed the Government's records. In this case there is credible testimony from Russell and his employees, including Mmes. Hancock and Hisaw, and Messrs. Underwood and Boomer, that information concerning the unreported income was not furnished for the preparation of the taxpayer's return.

The Court feels, however, that an extensive review of the authorities here would not be helpful since the question for this Court to decide is principally one of fact: did the taxpayer willfully and intentionally omit income from his return with the intent to evade a tax believed to be owing? We feel that the Government has discharged its burden to show these elements by clear and convincing evidence and therefore we hold that the fraud penalty was properly assessed and collected, and that the taxpayer is not entitled to a refund of the amount paid.