**Kenneth Poy LEE and Chow Joy Lee, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. GC 70–43–K.**

United States District Court, N. D. Mississippi, Greenville Division.

May 18, 1973.

James P. Knight, Jr., Jackson, Miss., for plaintiffs.

Jerome Fink, U. S. Dept. Justice, Washington, D. C., H. M. Ray, U. S. Atty., Oxford, Miss., for defendant.

## MEMORANDUM OPINION

KEADY, Chief Judge.

In obedience to the order of the United States Fifth Circuit Court of Appeals, in Lee v. United States, 466 F.2d 11, reversing our prior Judgment and remanding the cause for further proceedings, we have reconsidered the evidence in the light of the directions set forth by the Court of Appeals and make findings of fact and conclusions of law on the prior record as follows:

### FINDINGS OF FACT

Kenneth Poy Lee and Chow Joy Lee, plaintiff taxpayers, are husband and wife and resided at Greenwood, Mississippi, during the taxable years in issue, i. e., 1962, 1963 and 1964. They timely filed joint United States income tax returns for each of said years with the District Director of Internal Revenue at Jackson. Plaintiffs owned and operated, as a partnership, a grocery store and meat market business known as Acme Food Mart, at Greenwood. They had since 1953 been engaged in a grocery business at Greenwood, and through the ensuing years had expanded the size of their operation by moving into a larger store and by increasing the amount of their store fixtures and merchandise inventory. In addition to earnings from their business, plaintiffs received income from rental houses, interest on bank savings, building and loan association savings, and private loans.

Lee, as manager of the partnership business, made all the business decisions. He had a sixth grade education, and aft-

er serving during the 1940's in the United States Navy as a steward, worked in the Chicago area as cook, waiter and dishwasher in popular priced Chinese-American restaurants. Mrs. Lee is a native of China with no more than a six grade education in China and during the years at issue she knew or understood very little English. She attempted to overcome this handicap by reading courses at Greenwood after she and her husband moved to that city.

Lee did all the ordering and buying for the partnership and kept single entry records consisting of cash receipts and cash disbursements ledgers. He adopted this method of bookkeeping when he first began his grocery store operation at Greenwood under the name of Hoy's Food Market. In the regular course of his record keeping, Lee recorded all payroll and other business expenses, whether paid by check or by cash, and all cash sales taken from the day's total as per cash register tape. These sales and expenses were totaled monthly. There was no accounts payable or accounts receivable ledger. Although the business was principally conducted on a cash basis, some credit sales were made, but when collections were made, they were handled as cash items. Mrs. Lee did not participate in making entries on the records and had no understanding of the manner in which they were kept.

Plaintiffs reported on a calendar year basis. Each year in issue Lee did take to Clyde Neely, a Certified Public Accountant in Greenwood, his books and records and in the form and condition that they were introduced in evidence. These records disclosed an itemization of total sales, total purchases, total payroll and other business expenses, and also figures for the annual store merchandise inventory. The records reflected interest received from different payors, interest paid on notes due others, principally Greenwood banks, and also income derived from rental units and expenses in connection therewith. Plaintiffs' books and records were relied upon by Neely in preparing the partnership and individual tax returns. Neely, who is a respected CPA in the Greenwood area, had no suspicion that Lee was withholding vital information and not correctly showing all income. At no time did Neely suggest to Lee that he furnish more detailed information, nor did he ever make, or see need to make, an audit of the books and records. Lee depended upon Neely to prepare his income tax returns as he did not know how to make them out. Lee, however, did make out monthly sales tax returns after receiving instructions from the representatives of the Mississippi State Tax Commission; those returns tally in every detail with the monthly sales recorded on the taxpayers' books.

During the years at issue, Mrs. Lee's participation in the store was largely confined to the checkout counter, where she accepted money for purchases, made change for customers and rang up sales on the cash register. Many times Mrs. Lee would be stationed at the cash register with a line of customers waiting to be checked out. She was seen by Internal Revenue agents to total up goods being purchased by a customer on an adding machine, take the customer's check for the purchase and place it in a box kept below the cash register for that purpose, and fail to ring up the sale. She was not competent to attend the cash register. Moreover, at times the plaintiffs' 12 and 13 year old children assisted in checking out goods, undertook to make change for customers and operate the cash register as best they knew. On the witness stand Mrs. Lee admitted that often when busy she failed or forgot to ring the cash register to record various sales. Moreover, while Lee regularly totaled the day's cash register tape, he often did not reconcile the cash by comparing the total amount of cash in the register with the total dollar amount shown on the tape. It was his universal practice, however, to place the available cash on hand in a safe in the family residence located at the rear of the store.

Lee personally took his inventory at the end of each year, and the process consumed "maybe 3, 4 days, something like that." (R. 262). There was no cut-off so that merchandise continued to flow in and out of the store during the process; the quantity of merchandise was not counted but was estimated, section by section; the valuations were estimates of "shelf prices", or retail prices. (R. 264). There were large amounts owing to suppliers for merchandise, unknown to a large extent, which were not deleted from these inventories. (R. 409–410). Merchandise accounts payable known to be omitted were as follows:

| December 21, 1961 | $2,601.38 |
| December 31, 1962 | 4,511.19 |
| December 31, 1963 | 2,735.72 |
| December 31, 1964 | 4,366.94 |

Markup of merchandise was in the range of 20% from cost to selling price. The court, therefore, finds an overstatement in the inventory figures which Lee prepared for each taxable year as follows:

| | December 31st of | | | |
| | 1961 | 1962 | 1963 | 1964 |
|---|---|---|---|---|
| Per net worth computations | $38,176.44 | $39,235.67 | $37,411.53 | $36,543.68 |
| Less 20% mark-up | 7,635.29 | 7,847.13 | 7,482.31 | 7,308.74 |
| Balance at cost | $30,541.15 | $31,388.54 | $29,929.22 | $29,234.94 |
| Unpaid for | 1,451.38 | 4,511.19 | 2,735.72 | 4,366.94 |
| Corrected inventory | $29,089.77 | $26,877.35 | $27,193.50 | $24,868.00 |

Plaintiffs habitually maintained a cash fund which they kept as business cash in a safe as well as a personal cash hoard in a trunk in their bedroom. When the Internal Revenue agents first investigated plaintiffs' tax returns, about February 1, 1966, they asked about the amount of cash that the Lees had on hand December 31, 1961, and they understood from Lee that it was about the same amount as they then had on hand. Therefore, the agents determined that sum to be $5,931.05 by counting the cash in plaintiffs' cash register and safe. This cash was kept to handle customers' checks presented in the regular course of business. Lee did not understand the revenue agents to make any inquiry regarding his personal cash hoard that he had in his trunk, and failed to mention that to them. The court finds as a fact that Lee did, in fact, have $6,000 personal cash kept in his trunk in addition to nearly $6,000 cash maintained in the cash register and safe. This $12,000 in cash funds was expended by Lee to purchase real estate in 1962. This is confirmed by a rise in real estate holdings from $3,372.41 at December 31, 1961, to $35,009.19 at December 31, 1962, an increase of $31,636.-78, while mortgages increased between these two points in time by $18,257.67. Thus, the net investment in 1962-acquired real estate, $13,379.11, represents the down payments and installment payments on real estate. Necessarily Lee's cash on hand was not constant but fluctuated from time to time. When he made real estate purchases or other investments it might be depleted, but he would again start the accumulation of a currency fund. For example, on the date of trial, November 11, 1971, Lee produced currency from his trunk in excess of $12,000 which was money so privately held out in addition to what was being regularly maintained for cashing customers' checks.

There was no evidence of false entries, no bogus expense documents or invoices. There was no evidence of any items of income omitted, concealment of assets or showing of double set of books. Lee and his wife undertook as best they understood the inquiry to cooperate with

the Internal Revenue agents, and did not mislead them. Their records disclosed practically every asset item contained in the net worth computation.

From time to time Lee borrowed money for investment purposes and often elected to pay interest rather than deplete cash accumulation. Plaintiffs lived in a modest residence in the rear of their store in a black neighborhood in Greenwood. Mrs. Lee received no salary for her services, and all five of their children, began working in the store as they attained school age.

Obedient to the direction of the Court of Appeals, the court now finds as a fact that the net worth statement set forth in the government's computation is inaccurate as to merchandise inventory and currency on hand and the true and correct net worth computation is shown on Exhibit "A" hereto, which reflects an understatement of income as follows:

| | |
|---|---|
| 1962 | $12,577.17 |
| 1963 | 22,836.21 |
| 1964 | 13,754.99 [1] |

### CONCLUSIONS OF LAW

■ Having reconsidered the evidence and determined the foregoing facts, the court is faced with the single legal issue of whether plaintiffs were guilty of fraud in filing the tax returns in question. If they did not file false or fraudulent returns with the intent to evade tax, plaintiffs are entitled to recover the full amounts sued for since the assessments were made after the expiration of the three-year statute of limitations, 26 U.S.C. § 6501(a) and (c)(1). It is familiar law that to sustain such charge, the burden is upon the Commissioner of Internal Revenue to establish fraud by clear and convincing evidence; fraud is never imputed or presumed and a finding of fraud may not be based upon circumstances which, at most, create only suspicion. The courts have steadfastly held that proof of negligence or even gross negligence is not the legal equivalent of fraud, for fraud implies bad faith, intentional wrongdoing and a sinister motive. "Negligence, whether slight or great, is not equivalent to the fraud with intent to evade tax named in the statute. The fraud meant is actual, intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing. Mere negligence does not establish either." Webb v. Commissioner, 394 F.2d 366, 377 (5 Cir. 1968), quoting from Carter v. Campbell, 264 F.2d 930, 935–936 (5 Cir. 1959), and Mitchell v. Commissioner, 118 F.2d 308, 310 (5 Cir. 1951). The Court of Appeals in the instant case cited Webb with approval, 466 F.2d at p. 15.

■ Since the government relies upon a net worth plus expenditures method of computation to make out its case, we first consider how much gross income went unreported. These amounts have now been determined. In some cases, unreported and unexplained growth in net worth figures, in the light of the total evidence, has been regarded as a legitimate basis for inferring fraud. In the case sub judice, we are instructed that in viewing such figures, "the District Court should determine whether in the light of all surrounding circumstances 'fraudulent intent to evade tax liability' can be inferred." (466 F.2d at 16). The Supreme Court has admonished that conclusive effect may not be given net worth statements to prove criminal tax fraud since "careful study indicates that [the method] is so fraught with danger for the innocent that courts must closely scrutinize its use." Holland v. United States, 348 U.S. 121, 127, 75 S.Ct. 127, 99 L.Ed. 150, 159, cited in Fn. 7 of the Court of Appeals'

---

1. This contrasts with the government's contention that the understatement was as follows:

| | |
|---|---|
| 1962 | $27,848.82 |
| 1963 | 20,690.92 |
| 1964 | 15,217.64 |

opinion. Therefore, the court is obliged to consider all of the surrounding circumstances in weighing the validity of the government's claim that fraud has been proved in this case by net worth statements demonstrating an increase in net worth figures substantially greater than those indicated by the tax returns made over a three-year period.

There are several salient features in the evidence which effectively overcome a possible inference of fraud from the amounts of unreported income disclosed by the corrected net worth computation. In the first place, plaintiffs do not have the education, training or sophistication to realize that net worth increases may be used as a measure of income and thus know that substantial amounts of their income were not being reported. As Lee testified:

"I don't keep track of what I spend or how much money I make. When I buy those property, if I have cash, I pay some on cash or borrow some money, or both. I don't never keep up with how much I have in my pocket or how much money I have in the cash register. And I just don't keep up with how much money I spend or how much money I make. So I couldn't tell you what is—about spending more money than I make." (Tr. 105–106).

In the second place, because of the incompetent methods employed by plaintiffs in the operation of their grocery business, notably placing Mrs. Lee and young children in charge of the cash register, errors did inevitably creep into the sales records, and these were compounded by the negligent failure of Lee regularly to reconcile cash receipts. Thirdly, notwithstanding these inefficiencies, however, Lee tried to keep meticulous records in accordance with his best understanding although they contained no means by which errors might have been detected. All such records as were maintained by him were always brought to the attention of a reliable CPA, who used them in preparing tax re-

turns and found Lee cooperative. The tax advisor never criticized the records or suggested that better methods be adopted. Indeed, the plaintiffs relied implicitly upon Mr. Neely to prepare their tax returns properly and they would have readily furnished whatever information deemed necessary to make the returns accurate and complete. We are thus persuaded that the records which the plaintiffs did keep were within themselves consistent and were intended to cover all the income-producing activity in which the tax payers were engaged.

Moreover, the evidence shows no indication of misrepresentation or false bookkeeping by plaintiffs. The revenue agents who checked the records found no false entries or alterations on the books; they uncovered no false invoices or documents and were not misled by the plaintiffs. It is significant that the items contained on the net worth schedule prepared by the revenue agents were either furnished to them by the plaintiffs or were obtained through leads furnished by plaintiffs, excepting a small utility deposit.

In addition, Lee omitted legitimate deductions for purchases of merchandise in each of the years in question as well as certain small amounts of depreciation and investment credits. Such omissions are inconsistent with a course of fraudulent conduct by a taxpayer and serve to corroborate the conclusion that plaintiffs were guilty of nothing more than negligence and inefficiency in their record keeping.

Finally, another fact worthy of consideration is plaintiffs' lifestyle. They lived in the rear of a grocery store in an economically deprived section. The Lees and their family were frugal and industrious and did not indulge themselves in expensive tastes or extravagant living.

The above are countervailing considerations which oppose a possible inference of fraud arising from the net worth statements. When these various circumstances are considered in their total effect, the court concludes that plaintiffs

did act in good faith in submitting their tax returns, and any inference of fraud is strongly rebutted. Since the Commissioner has failed to carry the burden of establishing fraud with intent to evade tax by clear and convincing evidence, it necessarily follows that the plaintiffs are entitled to recover the full amount sued for.

Let judgment be entered accordingly.

### EXHIBIT A

| | Dec. 31, 1961 | Dec. 31, 1962 | Dec. 31, 1963 | Dec. 31, 1964 |
|---|---|---|---|---|
| Net Worth, Exhibit A, Pre-Trial Order | $103,491.06 | $127,040.20 | $141,447.88 | $149,174.45 |
| Delete inventories scheduled | ( 38,176.44) | ( 39,235.67) | ( 37,411.53) | ( 36,543.68) |
| Add corrected inventories herein | 29,089.77 | 26,877.35 | 27,193.50 | 24,868.00 |
| Add currency on hand found herein | 12,000.00 | | | |
| Corrected net worth: | $106,404.39 | $114,681.88 | $131,229.85 | $137,498.77 |
| Less: Net Worth at the Beginning of year | | 106,404.39 | 114,681.88 | 131,229.85 |
| Increase in Net Worth | | $ 8,277.49 | $ 16,547.97 | $ 6,268.92 |
| Add: Personal Expenditures, (Ex. A to pre-trial order) | | 7,656.97 | 6,400.38 | 13,665.63 |
| Less: Depreciation on Auto | | ( 589.62) | ( 589.62) | ( 589.62) |
| Adjusted Gross Income as Corrected | | $ 15,344.84 | $ 22,358.73 | $ 19,344.93 |
| Adjusted Gross Income as Reported | | 2,767.67 | ( 477.48) | 5,589.94 |
| Increase (or amount of income understated) | | $ 12,577.17 | $ 22,836.21 | $ 13,754.99 |