Johnny G. George and Wanda George (Georgacakis) v. Commissioner.
George v. Commissioner
Docket No. 1583-67.
United States Tax Court
T.C. Memo 1970-231; 1970 Tax Ct. Memo LEXIS 128; 29 T.C.M. (CCH) 989; T.C.M. (RIA) 70231; August 12, 1970, Filed. John P. Dwyer and Virgil L. Brown, 606 Bank of New Mexico Bldg., Albquerque, N.M., for petitioners. Richard J. Shipley, for respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined deficiencies in income tax for the years 1958 and 1959 and additions thereto for fraud and underpayment of estimated tax as follows: Year
Deficiency
Addition to tax
Addition to tax
under§ 6653(b)
under§ 6654
1958
$1,736.79
$ 868.40
$ 58.10
1959
5,192.29
2,971.14
55.38
$6,929.08
$3,839.54
$113.48 990 The respondent determined the deficiencies in question by computing the taxable income of petitioners under the net worth method. The primary issue is whether assessment and collection of any deficiencies and additions to tax are barred by the statute of limitations, which depends upon whether the petitioners filed false and fraudulent income tax returns for the years 1958 and 1959. If assessment and collection are not barred there remains the *130 question of the proper amounts, if any, of deficiencies and additions to tax. Findings of Fact Some of the facts have been stipulated and are incorporated herein by this reference. Johnny G. George and Wanda George are husband and wife and resided in Las Vegas, Nevada, on the date they filed their petition herein. [1] During the taxable years 1958 and 1959 they resided in Albuquerque, New Mexico and filed joint Federal income tax returns for such years with the district director of internal revenue, Albuquerque, New Mexico. During 1958 and 1959 their surname was Georgacakis. Such name was legally changed to George in 1960. Inasmuch as the present dispute involves the nature and extent of Johnny George's income producing activities during 1958 and 1959, Johnny George will hereinafter be referred to as the petitioner. The petitioner was born on July 5, 1919, in Cicero, Illinois. He graduated from high school and attended college for one year. At the date of the trial, he had been *131 engaged in or associated with gambling for about 34 years. In or around 1950, petitioner owned an interest in a business located in Las Vegas known as the 49er Club. This business failed and petitioner lost his investment therein. In 1949 the petitioner was married to Jackie DiNozi. They were divorced in 1952. At the time of the divorce, no property settlement was made because petitioner had no substantial property or cash at that time. Jackie DiNozi made loans to petitioner during and subsequent to their marriage. These loans, in the aggregate amount of $5,000, were outstanding throughout the years 1958 and 1959. During the years 1954, 1955, and 1956 the petitioner was located in Las Vegas, Nevada. During 1954, he owned and operated the Las Vegas Race Book, a horse parlor where wagers were accepted on horse races. The Las Vegas Race Book was sold by petitioner in 1954 or 1955 and the proceeds from such sale were utilized by petitioner to pay Federal excise taxes on wagering. On his Federal income tax return for 1954, petitioner reported a net loss in the amount of $9,273.75, arising from the operation of the Las Vegas Race Book. During 1955 and 1956, the petitioner was employed *132 by various gambling concerns in Las Vegas. On his Federal income tax return for 1955, he reported wages in the amount of $4,975 and on his return of 1956 he reported wages in the amount of $2,525.50 and tips in the amount of $800. The petitioner often sent money to his mother and father. On each of his returns for 1954, 1955, and 1956 petitioner claimed a dependency exemption for his father. On his return for 1954, he stated that he provided $600 for his father's support during such year. On his return for 1955 he stated that he provided $1,200 for his father's support during such year. On his return for 1956 he stated that he provided all of his father's support for such year. During January and February of 1957, petitioner was employed by a casino in Las Vegas and received wages in the amount of $1,446 during such period. Thereafter, in March 1957, he moved to Albuquerque, New Mexico. Upon his arrival in Albuquerque, his assets consisted of a 1955 Cadillac automobile upon which there was no outstanding indebtedness, some jewelry, an extensive wardrobe, cash in an indeterminate amount, and a piece of real estate located in Las Vegas. Before leaving Las Vegas the petitioner borrowed *133 $4,000 from John Jenkins for use as a gambling bank roll. Such amount constituted part of the cash petitioner had in his possession upon his arrival in Albuquerque. Upon his arrival in Albuquerque, the petitioner and Fred Dunivan operated a crap game, each having an equal interest therein. Such activity was illegal under the laws of New Mexico. The game was conducted at various locations in Albuquerque, the principal place being a used car lot named Johnny George Auto Sales. This car lot was opened by petitioner and Dunivan with 991 the intention of selling automobiles, but shortly became merely a front for the operation of the crap game. The crap game was not operated on any regular schedule. Rather, it was conducted whenever a sufficient number of players wished to play. In operating the game, petitioner and Dunivan acted as "the house," covering all bets made either for or against the shooter. On such bets they could either win or lose. However, over the long run, the law of averages would result in gain to them because of the fact that the actual odds paid by them to a bettor were less than the true odds on the bet. This differential between true odds and odds paid gave *134 petitioner and Dunivan a 1.4 or higher percentage advantage, depending upon the type of bet made. In operating the crap game, a bank roll was required which varied in size depending upon the number of players involved and the betting limits imposed with respect to a particular game. Generally, the bank roll consisted of about $3,000 in new $5 bills with additional sums in reserve. At various times, persons other than petitioner and Dunivan would contribute part of the bank roll, taking back a proportionate interest in the game. Generally, either petitioner or Dunivan would carry the bank roll during the operation of a game. Upon the completion of a game, the bank roll would be divided proportionately among those who had an interest in the game. The expenses incurred with respect to the operation of the game, such as cost of dice, were paid from the bank roll. In June or July 1957, W.D. (Buddy) Adair began working for petitioner and Dunivan. His duties consisted of taking care of the used car lot, acting as lookout man (to warn of the approach of police), and assisting in the operation of the crap game. He also obtained cash for petitioner and Dunivan by cashing checks at various *135 banks. Adair initially received $100 per week as wages and subsequently acquired an interest in the game for his services. During the operation of the crap game, petitioner was occasionally asked by some of the players to accept wagers on horse races. He initially declined to accept such wagers because he did not possess a wagering tax stamp. [2] In March 1958, he visited friends in Reno, Nevada. During such visit, he filed Form 11C, Special Tax Return and Application for Registry - Wagering, with the district director of internal revenue, Reno, Nevada, and thereby obtained a wagering tax stamp. Such form covered the period from March 1, 1958 to June 30, 1958. On this form, petitioner listed 430 Maryland Parkway, Las Vegas, Nevada, as his address and listed Las Vegas as the location where his business was conducted. *136 Before returning to Albuquerque, the petitioner stopped in Las Vegas and conferred with Joseph Wright, his former accountant. Wright agreed to file the monthly wagering excise tax returns for petitioner and to allow petitioner to utilize his Las Vagas address on such returns. The procedure established was that Wright would obtain the forms for the monthly returns in Las Vegas. Such forms would then be forwarded to petitioner in Albuquerque where petitioner would fill out the forms, thereafter returning the completed forms to Wright. Wright would then draw a check on a Las Vegas bank account maintained by petitioner and submit the check together with the completed form to the Reno office. After returning to Albuquerque, petitioner began accepting wagers on horse races. This activity was illegal under the laws of the state of New Mexico. Initially, he accepted wagers made by the players at the crap game. Thereafter, he maintained phones at various locations over which he accepted wagers. He took all wagers himself. He had no employees working the phones or accepting wagers on his behalf. Adair occasionally helped him in making deliveries and collections. Dunivan had no interest in *137 petitioner's bookmaking activity. In order to stimulate his bookmaking activity, petitioner purchased and distributed racing forms and out-of-state newspapers which carried racing results. He had learned that the local newspapers either carried no racing results or frequently erred in reporting such results. These papers and forms were delivered to petitioner in the names of Ken Martin or Ken Martin Enterprises, which were fictitious names which had been utilized by petitioner for many years in connection with his illegal gambling activities. 992 The petitioner himself financed his bookmaking activities. He accepted wagers which varied from $2 upward, occasionally to $500, and generally made the same payouts as were made by the race track. [3] However, in order to minimize the risk of loss, he imposed limits on the odds which he would pay, for example, 15 to 1. He also limited the size of wagers which he would accept if it appeared that the amount of a particular pay-off might exceed the amount which he could stand to lose. In some such instances the petitioner would "lay-off" or "broker" the wager to other bookmakers, making settlements by mailing currency. However, in such *138 instances the petitioner had no interest whatever in the wager. In the operation of his bookmaking operation, petitioner incurred expenses for purchasing papers and racing forms, maintaining phones, and mailing currency. During the months of July and August 1959, petitioner was away from Albuquerque working as an employee at the Cal-Neva Lodge at Lake Tahoe, Nevada, and during such period he did not carry on his bookmaking activities and his participation in the crap game. Throughout the years in question the petitioner did not utilize bank accounts to any significant degree, using instead safety deposit boxes. His various transactions were generally carried on by use of cash or cashiers checks. During the year 1959 petitioner *139 maintained a bank account under the name of Johnny George Wholesale for the purpose of obtaining new currency. Both petitioner and Dunivan kept contemporaneous records with respect to the operation of the crap game. Such records reflected the difference between the amount of the bank roll before a particular game and after the completion of that game. If the bank roll upon the completion of a game exceeded the bank roll at the beginning of such game, the difference was recorded as a win. If the bank roll upon the completion of a game was less than at the beginning of such game, the difference was recorded as a loss. The above method of determining wins and losses from the operation of the crap game was substantially the same as that employed by some casinos in Las Vegas. In his bookmaking operations the petitioner prepared daily records on printed tally sheets which reflected the wagers accepted (name of the horse and the amount of the bet) and the results thereof. These records were substantially the same as those which he had previously kept in connection with the operation of the Las Vegas Race Book. From such daily records weekly records were prepared by petitioner showing *140 the results of the daily operations and these weekly records were generally kept in petitioner's home. From time to time throughout 1958 and 1959 the local police raided the car lot and petitioner's residence. Petitioner and Dunivan had no contact or informer to warn them of impending police raids, and as a consequence the police were able on some occasions to obtain some of petitioner's records (crap game records and weekly records of his bookmaking activities). However, petitioner was able to destroy most of his daily bookmaking records in order to keep them out of the hands of the police. Petitioner filed monthly wagering excise tax returns for the months of April through December 1958, utilizing his weekly records. On such returns he reported receiving gross wagers in the amount of $13,284 during such period and reported excise tax liability in the amount of $1,328.40. Petitioner filed monthly wagering excise tax returns for the months of January through September 1959. On such returns he reported receiving gross wagers in the amount of $13,550 during the months January through May 1959 and excise tax liability in the amount of $1,355 for such period. For the months June through *141 September 1959, the petitioner reported that he had not received any wagers. All such returns were filed by petitioner under the above described procedure with Wright and listed thereon petitioner's address as 1062 So. Main Street, Las Vegas, Nevada, Wright's office address in Las Vegas. Petitioner's income tax returns for the years 1957, 1958, and 1959 were prepared by Harold Thompson, a certified public accountant located in Albuquerque. Thompson, who also prepared Dunivan's tax returns for such years, was recommended to petitioner by 993 Dunivan. Because of the nature of petitioner's occupation, both petitioner and Thompson expected that petitioner's returns might be audited. In view of this concern, Thompson endeavored to account for all transactions and income of petitioner. Because of police confiscation of petitioner's records with respect to his interest in the crap game, both petitioner's and Dunivan's returns with respect to income from the crap game were prepared from the records maintained by Dunivan. Petitioner did not advise Thompson of his bookmaking operation until the time of preparation of petitioner's return for the taxable year 1960. In their joint income *142 tax returns for the taxable years 1958 and 1959, the petitioners reported income from "Speculations", which represented income from petitioner's interest in the crap game. The amounts of gains and losses so reported in each of the years 1958 and 1959 were as follows: Gains
Losses
Net
Taxable year 1958
$37,617
$22,141
$15,466
Taxable year 1959
48,301
28,399
19,902 Included in the return for the taxable year 1958 was an amount of $390.80 which represented wages received by petitioner's wife during such year. In the return for the taxable year 1959, the petitioner also reported wages of $1,250 received from his work at the Cal-Neva Lodge and other income in the amount of $4,042.15. The returns for 1958 and 1959 did not indicate the receipt of any income from petitioner's bookmaking operations, nor was there any indication on such returns that he was engaged in a bookmaking operation. In their return for the taxable year 1958, the petitioners claimed the standard deduction, reporting therein adjusted gross income in the amount of $15,856.80 and taxable income in the amount of $13,656.80. In their return for the taxable year 1959, the petitioners claimed *143 the standard deduction, reporting therein adjusted gross income in the amount of $25,194.15 and taxable income in the amount of $22,394.15. In the notice of deficiency the respondent determined that the petitioners had understated their taxable income for the years 1958 and 1959. In determining the petitioners' taxable income the respondent employed the net worth method. He determined their net forth and increases therein for the years in question as follows: ASSETS
Dec. 31, 1957
Dec. 31, 1958
Dec. 31, 1959
Cash on hand
$ 2,099.89
$ 2,500.00
$ 0
Cash in Banks:
Johnny George Auto Sales
11.87
113.97
127.37
George, George and Anton
192.35
97.38
Johnny George
466.76
Johnny George Wholesale
350.00
First Nat' 1. Bank of Nevada
29.45
Republic & Gazette-Deposit
46.66
48.66
Loans Receivable:
Adair
1,000.00
1,000.00
1,000.00
John J. Jenkins
1,000.00
Mortgage Receivable- Trombley
17,335.24
Auto Inventory-Johnny
George Auto Sales
3,732.50
2,500.00
0
1955 Cadillac Auto
7,758.52
7,758.52
7,758.52
5 acres - Las Vegas
5,000.00
5,000.00
5,000.00
Millette Land
19,133.34
9,800.00
Logan Land - lots
24,131.25
24,131.25
Logan Land 108.4 acres
63,450.00
63,450.00
614 Maderia N.E. house and lot
27,018.00
27,084.90
614 Maderia N.E. furniture and
948.87
948.87
fixtures
Lot 9 Black 8 Sandia Manor
2,200.45
0
Lou Lebby's on The Hill-
500.00
1,063.65
Partnership
Montano Land
8,000.00
401 San Pablo N.E.
15,879.19
Total Assets
$19,602.78
$156,493.41
$183,571.24
*144 994 LIABILITIES
Dec. 31, 1957
Dec. 31, 1958
Dec. 31, 1959
First National Bank of Nevada
$ 58.85
0
(overdraft)
George, George & Anton
5,000.00
5,000.00
Loan (unidentified in- dividual)
20,000.00
20,000.00
20,000.00
Mrs. Fedora Nemirow (ex-wife)
5,000.00
5,000.00
5,000.00
Levitch - Loan
3,000.00
3,000.00
2,200.00
John J. Jenkins - Loan
4,000.00
4,000.00
0
B. L. Mason - Loan
4,000.00
0
Nick Kapnison - Loan
2,000.00
Frank Marchese - Loan
2,000.00
N. W. Glassman - RealEstate
1,977.39
0
Contract
F. Montano - Real Estate Contract
6,579.95
Millette Mortgage Payable
15,253.40
13,987.32
H. V. Logan - Mortgage Payable -
22,443.75
21,361.44
Lots
H. V. Logan - Mortgage payable -
57,637.50
56,278.26
108.4A
614 Maderia N.E. Mortgage payable
16,718.06
16,338.30
Option Monies - Trombley
1,483.26
0
Deferred Gain - Trombley
9,187.75
Installment Sale
Total Liabilities
$32,000.00
$156,572.21
$159,933.02 $159,933.02 Date
Assets
Liabilities
Net Worth
Increase in
Net Worth
Dec. 31, 1957
$ 19,602.78
$ 32,000.00
($12,397.22)
Dec. 31, 1958
156,493.41
156,572.21
( 78.80)
$12,318.42
Dec. 31, 1959
183,571.24
159,933.02
23,638.22
23,717.02
*145 The above is correct except with respect to cash on hand as of December 31, 1957, and loans payable to B. L. Mason as of December 31, 1959. Petitioner had cash of $4,000 as of December 31, 1957, and a loan payable to B. L. Mason of $3,500 as of December 31, 1959. Petitioner had borrowed $4,000 from Mason in 1958. During 1959 he repaid $500 of this loan and the balance remained outstanding as his liability throughout 1959. It was not until 1960 that Dunivan assumed this liability. In view of these modifications, petitioners' net worth and increases therein for the years in question were as follows: Date
Assets
Liabilities
Net Worth
Increase in
Net Worth
Dec. 31, 1957
$ 21,502.89
$ 32,000.00
($10,497.11)
Dec. 31, 1958
156,493.41
156,572.21
( 78.80)
$10,418.31
Dec. 31, 1959
183,571.24
163,433.02
20,138.22
20,217.02
In the notice of deficiency the respondent determined that the petitioner made expenditures during the years 1958 and 1959 in the respective amounts of $9,607.20 and $23,135.97. Petitioners made the following expenditures during the years 1958 and 1959: 995 Expenditures
1958
1959
Federal income tax paid
$ 2,071.81
$ 5,913.44
FICA taxes paid
31.25
Federal Tax penalties paid
17.87
5.00
Life insurance premiums
87.10
345.10
New Mexico state income taxes
67.90
105.48
Attorney fees
600.00
Court costs
100.00
Preparation of tax returns
12.88
25.75
Gravel exploration
449.58
Down payment Millette contract
1,500.00
Interest paid on investments:
614 Maderia
695.88
910.00
Millette
603.32
733.92
N.W. Glassman
29.89
H.V. Logan
5,058.45
F. Montano
179.95
614 Maderia (trust fund)
507.20
486.24
Ad valorem tax
150.99
Wife's income spent prior to marriage
390.80
Rent-Lake Tahoe
0
1,200.00
Phones
600.00
600.00
Lights, water and gas
200.00
250.00
Food
1,000.00
2,000.00
Clothing
300.00
1,000.00
Entertainment
500.00
600.00
Miscellaneous
400.00
800.00
Maid
0
300.00
Doctor bills
0
500.00
Church
250.00
400.00
Total
$9,234.65
$22,745.15
*146 In the notice of deficiency the respondent correctly dete In the notice of deficiency the respondent correctly determined that petitioners were entitled to deductions for the years 1958 and 1959 in the respective amounts of $2,884.94 and $10,632.85. During the years 1958 and 1959, the petitioners did not receive any gifts, inheritances, legacies, or devises. During the year 1959, the petitioners received an advance from the BFJ Land Company in the amount of $49.85. During the year 1959, petitioners realized a long-term capital gain in the amount of $1,412.32 with respect to the Trombley sale, one-half of which, $706.16, is excludable from taxable income. In the notice of deficiency the respondent determined that petitioners understated their taxable income for the years 1958 and 1959 in the respective amounts $5,383.88 and $13,069.98 computed as follows: 1958
1959
Net Worth Increase
$12,318.42
$23,717.02
Expenditures
9,607.20
23,135.97
Total
$21,925.62
$46,852.99
Less: Excludable receipts
0
756.01
Adjusted gross income
$21,925.62
$46,096.98
Less: Deductions
2,884.94
10,632.85
Taxable Income
$19,040.68
$35,464.13
Less: Taxable income reported
13,656.80
22,394.15
Understatement of taxable income
$ 5,383.88
$13,069.98
*147 On their returns for the years 1958 and 1959, petitioners understated their taxable income in the respective amounts of $3,111.22 and $9,179.16 computed as follows: 1958
1959
Net Worth Increase
$10,418.31
$20,217.02
Expenditures
9,234.65
22,745.15
Total
$19,652.96
$42,962.17
Less: Excludable re- ceipts
0
756.01
Adjusted gross income
$19,652.96
$42,206.16
Less: Deductions
2,884.94
10,632.85
Taxable income
$16,768.02
$31,573.31
Less: Taxable income reported
13,656.80
22,394.15
Understatement of taxable income
$ 3,111.22
$ 9,179.16
Opinion The parties are in agreement that assessment and collection of any deficiencies and additions to tax for the years 1958 and 1959 are barred by the statute of limitations 996 unless the petitioners filed false and fraudulent income tax returns with intent to evade tax for those years. Section 6501 of the Internal Revenue Code of 1954. [4]
*148 The issue of fraud is one of fact. William G. Stratton, 54 T.C. 255, and cases cited therein. Under section 7454(a) of the Code [5] the burden of proof with respect to fraud is upon the respondent. Fraud is never presumed. It must be affirmatively established by clear and convincing evidence. Clark v. Commissioner, (C.A. 9) 266 F. 2d 698, affirming in part a Memorandum Opinion of this Court; Carter v. Campbell, (C.A. 5) 264 F. 2d 930; Luerana Pigman, 31 T.C. 356; and Arlette Coat Co., 14 T.C. 751. The fraud contemplated by the statute is actual, intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing. The question of intention is a factual one to be resolved from a consideration of the entire record. William G. Stratton, supra.
The respondent determined the deficiencies *149 in question by computing the taxable income of the petitioners under the net worth method. Most of the items utilized in the net worth computation were stipulated by the parties. The items which remained in dispute were cash on hand and loans payable and receivable. At the trial both parties presented evidence with respect to these disputed items. The evidence adduced supports the respondent's determinations except as to two items, cash on hand as of December 31, 1957, and loans payable to B. L. Mason as of December 31, 1959. In support of his determination that petitioner had cash on hand in the amount of $2,099.89 as of December 31, 1957, the respondent introduced a cash flow statement for petitioner for the period June 1, 1957 to December 31, 1957. The various transactions included in such statement were substantiated by the evidence. However, we think the cash flow statement was incomplete in that it failed to take into account the proceeds of a loan in the amount of $2,440 received by petitioner from a finance company on May 29, 1957. We have, therefore, concluded that as of December 31, 1957, the petitioner had cash on hand of $4,000. The respondent also determined that *150 petitioner had no outstanding loan payable to B. L. Mason as of December 31, 1959. However, the evidence establishes that petitioner had a loan payable to Mason in the amount of $3,500 as of that date. For the taxable years 1958 and 1959 the petitioners reported taxable income in the respective amounts of $13,656.80 and $22,394.15, whereas their taxable income for those years computed under our findings was $16,768.02 and $31,573.31, respectively, resulting in understatements in the respective amounts of $3,111.22 and $9,179.16. From a careful consideration of the record as a whole, it is our conclusion that the respondent has not established by clear and convincing evidence that the petitioners' returns for the taxable years 1958 and 1959 were false or fraudulent with intent to evade tax. The understatement of income is not alone sufficient to establish fraudulent intent. See William G. Stratton, supra, and cases cited therein. It is true, of course, that consistent and substantial understatements of income over a number of years may constitute persuasive evidence of fraud. See Baumgardner v. Commissioner, (C.A. 9) 251 F. 2d 311, affirming a Memorandum *151 Opinion of this Court, and cases cited therein. However, the above understatements, particularly since they cover only two years, are not sufficient to establish a consistent pattern of substantially underreporting taxable income, which would support a finding of fraud. 997 We have carefully considered the respondent's contention that certain other actions of the petitioner constitute indicia of fraud and that such indicia, coupled with the understatements, are sufficient to satisfy his burden of proof. The respondent points to the fact that the petitioner destroyed daily records of his bookmaking activities for the years 1958 and 1959; that he filed his wagering excise tax returns with the district director at Reno, Nevada, instead of Albuquerque and represented that the business of accepting wagers was conducted in Las Vegas rather than Albuquerque; that he did not inform his accountant of his bookmaking activities for the years 1958 and 1959; and that his returns for such years failed to disclose any income from bookmaking operations and failed to indicate that he was engaged in such operations. The petitioner took the stand and testified that he destroyed the daily records *152 of his bookmaking activities when he felt it was necessary to avoid their seizure by the local police and that they were not destroyed for the purpose of concealing any tax which was due. The evidence shows that he was raided on several occasions in the years in question. He also testified, in effect, that he obtained his wagering tax stamp and filed his wagering excise tax returns in Nevada rather than in New Mexico in order to prevent detection by the police of Albuquerque that he was carrying on illegal bookmaking. He further stated that the net result of his bookmaking operations in each of the years 1958 and 1959 was a loss, that he did not think he was required to report such losses in his income tax returns for those years, and that this accounts for his failure to inform his accountant or to make any reference to such bookmaking activities in the returns. He stated that at the time he prepared his 1958 return he had the weekly records of his bookmaking activities and that they showed a net loss from such operations, but that such weekly records, as well as the weekly records for 1959, were later seized by the police and were therefore not available to show the internal revenue *153 agents. He further stated that he also felt that he had put the Internal Revenue Service on notice that he was engaged in bookmaking by filing his wagering excise tax returns at Reno, Nevada. While the evidence does arouse suspicion that the petitioner had a dual purpose, namely, that of concealing taxable income as well as protecting himself from prosecution by state authorities, and that hence he filed false returns with intent to evade a part of his tax liability, such evidence falls short of clearly and convincingly establishing that such was the case. We accordingly hold that assessment and collection of any deficiencies in tax and additions to tax for the taxable years 1958 and 1959 are barred by the statute of limitations. Decision will be entered for the petitioners. Footnotes
1. The petitioners were married in December 1958. The petitioner Wanda George brought no significant assets into the marriage, nor did petitioner contribute to her support prior to the marriage.↩
2. § 4401 of the I.R.C. of 1954 imposes a 10% excise tax on "wagers" as defined in § 4421. In addition § 4411 imposes a tax of $50.00 on any person accepting wagers and § 4412 requires the registration of any person accepting wagers. Bets made in the operation of a crap game do not constitute wagers within the meaning of § 4421 and no Federal tax or registration requirements are therefore imposed with regard to the operation of a crap game. Racing tracks operating as pari-mutuel wagering enterprises licensed under state law are exempt from the 10% excise tax imposed under § 4401↩.
3. The pay-outs made by race tracks are computed after the retention by the track of a percentage of the total wagers placed, such percentage generally generally ranging from 16 to 18 percent. Since the petitioner did not have the volume of wagers placed at race tracks, the amount which he might expect to gain would not parallel the amount retained by the track. The petitioner stood to win or lose according to the outcome of the particular races.↩
4. SEC. 6501. LIMITATIONS ON ASSESSMENT AND COLLECTION. (a) General Rule. - Except as otherwise provided in this section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed (whether or not such return was filed on or after the date prescribed) or, if the tax is payable by stamp, at any time after such tax became due and before the expiration of 3 years after the date on which any part of such tax was paid, and no proceeding in court without assessment for the collection of such tax shall be begun after the expiration of such period. * * * (c) Exceptions. - (1) False return. - In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time.↩
5. Sec. 7454. BURDEN OF PROOF IN FRAUD AND TRANSFEREE CASES. (a) Fraud. - In any proceeding involving the issue whether the petitioner has been guilty of fraud with intent to evade tax, the burden of proof in respect of such issue shall be upon the Secretary or his delegate.↩